**UNITED STATES of America, for the Use of BLUMENTHAL–KAHN ELECTRIC LTD. PARTNERSHIP,**

and

**Blumenthal–Kahn Electric Ltd. Partnership, Plaintiffs,**

v.

**AMERICAN HOME ASSURANCE CO., Defendant.**

**No. Civ.A. 02–743–A.**

United States District Court, E.D. Virginia.

Sept. 4, 2002.

Thomas Moore Lawson, Lawson and Silek, P.L.C., Winchester, VA, for plaintiffs.

Douglas Clark Proxmire, Patton Boggs, P.L.C., Washington, DC, for defendants.

John T. Donelan, Law Offices of John T. Donelan, Alexandria, VA, Mark White Byrum, Jr., Byrum Law Office, P.C., Alexandria, VA, for cross-claimants.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this dispute arising out of a construction project ("Project") at Washington Reagan National Airport ("Airport"), an electrical subcontractor sues on the general contractor's bond under the Miller Act,[1] or, alternatively, under its Virginia counterpart,[2] to recover for the work and materials it expended on the Project. At issue on a threshold dismissal motion is whether either statute applies to the Project, given that the Airport is operated and managed by the Metropolitan Washington Airports Authority ("MWAA"), which is neither a federal nor a state agency.

For the reasons that follow, it is clear that neither statute applies to construction projects at the Airport, and hence the motion to dismiss must be granted.

### I.[3]

Plaintiff Blumenthal–Kahn Electric Ltd. Partnership ("BKELP"), a Maryland limit-

---

1. 40 U.S.C.A. §§ 270a, 270b.

2. Va.Code § 2.2–4337 *et seq.*

3. The facts recited here are derived from the complaint, and are assumed to be true solely for purposes of resolving the motion to dismiss. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 217–18 (4th Cir.1994).

ed partnership with its principal place of business in Baltimore County, Maryland, is an electrical subcontractor that does business in Maryland, the District of Columbia, and Virginia. Defendant American Home Assurance Company ("AHAC") is a New York corporation with its principal place of business in New York City. AHAC is in the business of writing insurance and issuing construction bonds throughout the United States, including Virginia.

Although not a party to this action, the MWAA is nonetheless central to the resolution of the issue presented, given its role as the Airport manager. The MWAA is an independent entity created in 1986 by acts of the Virginia General Assembly and the District of Columbia City Council. *See* Va.Code § 5.1–153 and D.C.Code Ann. § 7–1252. Since its inception, this hybrid regional agency has operated and managed the Airport under the terms of a 50 year lease agreement with the Secretary of Transportation. *See* 49 U.S.C.A. §§ 49102(a) & 49104.[4]

This controversy grows out of an MWAA contract to construct a pedestrian tunnel at the Airport designed to connect an existing parking garage with historic Terminal A. The general contractor for the Project was San Jose Construction Group, Inc. ("San Jose"), a Maryland corporation with its principal place of business in Washington, D.C. In this connection, San Jose entered into a general contract for the Project with MWAA on August 12, 1999. Pursuant to this contract and the MWAA's Contracting Manual, San Jose secured a Payment Bond ("bond") from AHAC for the protection of Project subcontractors and materialmen. On November 12, 1999, San Jose entered into a subcontract with City General, Inc. ("CGI"), a Maryland corporation with its principal place of business in Washington, D.C., to

provide labor and materials to complete the electrical work for the Project. Thereafter, on March 20, 2000, CGI entered into a subcontract with BKELP to provide field engineering and administrative management for the Project's electrical scope of work.

During the course of the Project, it became apparent that MWAA's engineering documents were incomplete and inaccurate, and could not be relied on to complete the Project. In response to CGI's requests for clarification of the documents, MWAA made substantial changes to the original plans, but required San Jose and its contractors to adhere to the original Project completion date. While CGI had sufficient resources to perform the original contract in a timely manner, it was unable to accommodate MWAA's changes to the plans, and still complete its scope of work in accordance with the original schedule. As a result, San Jose halted payments to CGI in December 2000, and CGI, in turn, was unable to pay its subcontractors and suppliers, including BKELP. A month later, San Jose threatened to terminate CGI from the Project.

In an effort to complete the Project in accordance with the original schedule and to avoid CGI's termination, San Jose, in January 2001, required BKELP to provide labor to perform electrical work on the Project, outside the scope of CGI's contract. Additionally, on March 15, 2001, on San Jose's demand, CGI issued an open purchase order to BKELP for additional labor to be directed by San Jose. Ultimately, BKELP provided the necessary labor, materials, and management that substantially completed its original contractual obligations to CGI and the additional work required by San Jose.

4. The MWAA also manages the Washington– Dulles International Airport.

Also in January 2001, San Jose agreed to make joint check payments to CGI's subcontractors and suppliers to aid CGI in the completion of its work. Yet, San Jose did not follow through on this agreement, and made no further payments to CGI. San Jose's failure to make these payments caused CGI's inability to maintain sufficiently skilled workers to meet San Jose's schedule, as well as to secure the necessary materials.

BKELP claims that in completing both its contract with CGI and the work directed by San Jose, it incurred expenses totaling $813,221.53, of which only $28,022.50 has been paid, leaving $785,199.03 still due and owing to BKELP. After requesting payment from CGI without success, BKELP put San Jose and AHAC on notice of a claim against the AHAC bond. AHAC then requested submission of a proof of claim. BKELP responded to this request by submitting a proof of claim with supporting documentation. Work on the Project continued in November and December 2001. The last date BKELP supplied labor to the Project for which a claim has been made on the AHAC bond was December 7, 2001. The last date BKELP supplied materials to the Project for which a claim has been made on the AHAC bond was December 20, 2001.

BKELP's five-count complaint in this case seeks recovery from AHAC under the Project payment bond in the amount of $785,199.03. AHAC's motion to dismiss attacks only the first two counts.[5] Count I seeks recovery against the bond under the federal Miller Act for work done and materials supplied to the Project. Count II seeks the same relief under Virginia's counterpart to the federal Miller Act, commonly referred to as the "Little Miller Act."

## II.

### A.

■ AHAC argues that Count I, which is based on the Miller Act, should be dismissed as that Act has no applicability to the MWAA construction projects. Analysis of the Act's applicability properly begins with the purpose and terms of the statute itself.

When subcontractors and materialmen working on private buildings and projects are not paid for work done or materials supplied, they may file mechanic's liens under state law to ensure collection of amounts due and owing. *See* Va.Code § 43–3 *et seq.* This remedy is not available to subcontractors and materialmen working on federal buildings or projects; mechanic's liens on such buildings and projects are prohibited. *See, e.g., United States for Use of Gen. Elec. Supply v. USF & G,* 11 F.3d 577, 580 (6th Cir.1993). To provide a remedy for subcontractors and materialmen in such circumstances, Congress passed the Miller Act, which requires that "before any contract for the construction, alteration, or repair of any public building or public work *of the United States* is awarded, the general contractor shall furnish to the United States [a performance bond and a payment bond]." 40 U.S.C. § 270a(a) (emphasis added). Without the Miller Act's requirement that the prime contractor furnish a payment bond, subcontractors and materialmen have no adequate means of collecting unpaid compensation withheld by the federal government. The Miller Act's requirement of a payment bond allows subcontractors and materialmen who have not been paid for work or materials supplied to federal projects to sue on the bond for any compensation due. *See Washington*

---

5. Not at issue at this time are Count III for breach of contract, Count IV for specific performance, and Count V for bad faith refusal to make payment on the bond.

**714**

*Metropolitan Area Transit Authority, ex rel. Noralco Corp. v. Norair Engineering Corp.*, 553 F.2d 233, 235 (D.C.Cir.1977). Thus, in passing the Miller Act, Congress sought to place subcontractors and materialmen working on federal buildings and projects on essentially the same footing in terms of security for payment as subcontractors and materialmen working on private buildings or projects; for both groups, the security for payment is a payment bond that general contractors are required to furnish as a condition of the award of a construction contract. As an added measure of protection for subcontractors and materialmen on federal projects, the Miller Act grants federal jurisdiction over cases brought pursuant to the Act, regardless of the amount in controversy. *See* 40 U.S.C.A. § 270b(b).

The Miller Act's applicability is not unlimited; by its terms, the Act applies only to construction or alteration of a "public building or public work of the United States." 40 U.S.C.A. § 270a. Thus, the question presented by the motion to dismiss BKELP's Miller Act claim is whether the Project—the work to construct a pedestrian tunnel at the Airport—constitutes construction or alteration of a "public building or public work of the United States." *Id.*

The key to answering this question is found in the Metropolitan Washington Airports Authority Act of 1986 ("MWAA Act"), 49 U.S.C. § 49101 *et seq*, which makes clear that the MWAA is a "political subdivision" that is "independent of Virginia and its local governments, the District of Columbia, and the United States Government." 49 U.S.C. § 49101(a)(2)–(3). Given that the MWAA is not a creature or part of the federal government, but is instead a political subdivision created by state statutes, that is independent of the federal government, then it follows that the MWAA's Project in this case is not a "public work of the United States" and therefore not subject to the Miller Act. Put differently, Airport facilities and construction projects relating to these facilities are under the MWAA's authority and management; they are MWAA works or projects, not public works or projects of the United States subject to the Miller Act.

The MWAA Act further underscores the non-federal nature of the MWAA and its facilities by providing that the MWAA is "not subject to the requirements of *any law* by reason of the retention of the United States Government of the fee simple title to those airports." 49 U.S.C. § 49111(b) (emphasis added). This clearly means that the MWAA and hence, the construction projects the MWAA undertakes at the Airport,[6] are not subject to the requirements of the Miller Act even though, as is true here, the federal government retains ownership of the land on which the Airport is built.

In sum, the Miller Act's plain language limits that Act's applicability to public buildings and works of the United States; and, the equally plain language of the MWAA Act makes clear that the MWAA and its projects at the Airport are not public works of the United States, and

---

6. Plaintiff argues unpersuasively that this provision applies only to the MWAA, and not to the MWAA's contractors, who must still comply with the Miller Act. The flaw in this argument is the failure to recognize that the Miller Act imposes correlative duties on the federal government, and would-be general contractors: the federal government may not award a contract unless the general contractor provides the requisite bonds and the general contractor must provide the bonds to qualify for the award. Thus, it makes no sense to argue, as BKELP does here, that the MWAA is exempt from the Miller Act, but its contractors are not. If the Miller Act does not apply to the MWAA, then it follows, inexorably, that the Miller Act does not apply to contractors on MWAA projects.

hence these projects are not subject to the requirements of the Miller Act.

This conclusion finds firm support in the relevant caselaw from other circuits.[7] At least three decisions announce and apply the sensible principle that the Miller Act does not apply where, as here, the work in issue was not contracted for by the United States, an agency of the United States, or an entity acting as an agent of the United States. *See United States for the Use of General Electric Distributing Corp. v. Centerline Gardens, Inc.*, 253 F.2d 133, 134–35 (6th Cir.1958); *United States for Use of Tri–State Road Boring, Inc. v. USF & G Co.*, 959 F.Supp. 345, 347 (E.D.La. 1996); *United States v. Mattingly Bridge Co.*, 344 F.Supp. 459, 461 (W.D.Ky.1972).

Particularly instructive in this regard is the Sixth Circuit's decision in *United States for the Use of General Electric Distributing Corp. v. Centerline Gardens, Inc.*, 253 F.2d at 134–135. There, the federal government entered into a long-term (75 years) lease of federal land with a private corporation. The lease contemplated that the corporation would construct a military housing project and lease this housing to military and civilian personnel designated by the Commanding Officer of the Detroit Tank Arsenal. The corporation entered into a contract with a general contractor to build the project. The general contractor furnished no bonds. An unpaid supplier of materials sought to sue under the Miller Act. On these facts, a unanimous Sixth Circuit panel held that the Miller Act did not apply, notwithstanding that the construction pro-

ject occurred on federal land, for a federal purpose, and that the buildings constructed were to become the property of the United States.

Critical to the result, in the Sixth Circuit's view, was the fact that the federal government was not a party to the project construction contract; instead, a non-federal entity, the lessee corporation, awarded the contract. Thus, the project was not a federal project, it was the lessee corporation's project and hence the Miller Act did not apply. So, too, in this case, the federal government was not a party to the Project contract; instead, the MWAA, a non-federal entity, awarded the contract, and hence the Project was not a federal project, but an MWAA project to which the Miller Act does not apply.

AHAC's cited cases are both distinguishable and not contrary to the result reached here; indeed, those cases are entirely consistent with the principle applied in *Centerline Gardens, Tri–State*, and *Mattingly Bridge*, but reach a different result because the United States or an agency of the United States was a party to the construction contracts in those cases. First, in *Empire Plastics Corp. v. Western Casualty and Surety Co.*, the Tenth Circuit held that the Miller Act was applicable to a contract between an Air Force Base Exchange and a contractor for renovation of a Base Exchange building on an Air Force Base. 429 F.2d 905, 906–07 (10th Cir.1970). Although the Base Exchange was a non-appropriated fund activity, there is no doubt that unlike the MWAA, it is a federal entity.[8] Indeed, the Air Force reg-

---

**7.** Remarkably, there is no controlling legal authority on this question despite the fact that numerous construction projects have been undertaken at the Airport during the sixteen-year period the MWAA has been operating and managing the Airport.

**8.** Non-appropriated funds are "funds generated by Department of Defense military and

civilian personnel and their dependents and used to augment funds appropriated by the Congress to provide a comprehensive morale-building, welfare, religious, educational, and recreational program, designed to improve the well-being of military and civilian personnel and their dependents." 32 C.F.R. § 842.127(c).

ulations governing non-appropriated funds state that non-appropriated fund activities are instruments of the federal government.[9] 32 C.F.R. § 842.127(d). There is also no doubt that unlike the MWAA Project, the renovation of the Base Exchange was a federal project. Thus, *Empire Plastics* is factually distinguishable from this case, and consistent with the result reached here.

Similarly, *United States to Use of Noland Co. v. Irwin*, 316 U.S. 23, 62 S.Ct. 899, 86 L.Ed. 1241 (1942), a case growing out of Depression-era New Deal legislation, is both factually distinguishable from this case, yet fully consistent with it. There, the Assistant Secretary of the Interior contracted for the building of a library at Howard University, which the Secretary of the Interior had designated as a "public work" pursuant to his authority under the National Industrial Recovery Act.[10] *Id.* at 26–27, 62 S.Ct. 899. Again, unlike the instant case, the federal government was a party to the contract in *Irwin,* and the project there was plainly a federal public work.

In summary, the Miller Act is inapplicable to the MWAA's Project at the Airport because neither the federal government nor any agent or agency of the federal government contracted for the Project, and because the Project is not a public work or building of the United States.

## B.

AHAC argues that Count II, which is based on Virginia's so-called "Little Miller Act,"[11] should also be dismissed because that Act, too, has no applicability to the MWAA facilities and projects. Here again, as in the case of the federal Miller Act claim, the analysis properly begins with an examination of the Little Miller Act's purpose and terms.

The General Assembly of Virginia enacted the Little Miller Act as part of Virginia's Public Procurement Act (VPPA)[12] for the same reason Congress passed the Miller Act, namely to provide a measure of protection to subcontractors and materialmen working on state buildings or construction projects because the usual mechanic's lien remedy is unavailable in that context. *See, e.g., Thomas Somerville Co. v. Broyhill,* 200 Va. 358, 105 S.E.2d 824, 828 (1958).

As was true with the federal Miller Act, the Little Miller Act's applicability is not unlimited. Thus, the Little Miller Act requires the furnishing of performance and payment bonds by a contractor only in connection with the award of either (1) any "public construction contract exceeding $100,000 to any prime contractor," or (2) any construction contract exceeding $100,000 awarded to any prime contractor requiring the performance of labor or the furnishing of materials for "buildings,

---

9. A non-appropriated fund instrumentality is a *"federal government instrumentality* established to generate and administer nonappropriated funds for programs and services contributing to the mental and physical wellbeing of personnel." 32 C.F.R. § 842.127(d) (emphasis added).

10. The Secretary of the Interior, as Administrator of the Federal Emergency Administration of Public Works, was statutorily directed to "prepare a comprehensive program of public works, which shall include among other things ... any projects of the character here-

tofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public." *Irwin,* 316 U.S. at 24, 62 S.Ct. 899.

11. BKELP recognizes that Counts I and II are pled in the alternative, as they are mutually exclusive: If the Miller Act applies to the Project, then the Little Miller Act cannot apply and vice versa. Of course, as the result reached here demonstrates, neither statute is applicable.

12. Va.Code § 2.2–4300 *et seq.*

structures or other improvements to real property owned by a public body." Va. Code § 2.2–4337.

The Airport Project fits into neither of these categories. Again, because the MWAA is, by state and federal statute,[13] independent of Virginia, it follows that the MWAA's contract with San Jose for the Project is plainly neither a Virginia "public construction contract," nor a construction contract requiring the performance of labor or furnishing of materials for "buildings, structures or other improvements to real property owned by a public body" of Virginia. By its terms then, the Little Miller Act is inapplicable.

The Virginia MWAA Act further highlights the agency's independence from the Commonwealth by specifically exempting the MWAA from compliance with the VPPA requirements, which include those of the Little Miller Act. Va.Code § 5.1–174 ("[in] light of the multijurisdictional nature of the [MWAA], an exemption is hereby provided to the [MWAA] from the provisions of the Virginia Public Procurement Act."). Thus, the plain language of the

Virginia MWAA statute is dispositive of the question of whether the MWAA must comply with the Little Miller Act's requirements.

Further undermining BKELP's argument that the Little Miller Act governs MWAA projects is the Virginia MWAA Act's provision empowering the MWAA to enact, and be bound by, its own regulations regarding construction of Airport facilities. See Va.Code §§ 5.1–152, 156–157.[14] This statutory scheme is further evidence that the General Assembly intended the MWAA to be governed not by the VPPA, but by its own regulations. It is noteworthy that the MWAA, pursuant to its rulemaking authority, has adopted procedures governing its construction contracts, which, like the Miller Act, require a prime contractor on state projects to furnish a payment and performance bond as a condition of being awarded the contract.[15]

The inapplicability of the Little Miller Act to the MWAA's projects was recently confirmed by the Fourth Circuit's decision in *Washington–Dulles Transportation, Ltd. v. Metropolitan Washington Airports*

---

**13.** *See* 49 U.S.C. § 49101(a)(2)–(3) (stating that the MWAA is a "political subdivision" that is "independent of Virginia and its local governments, the District of Columbia, and the United States Government."); Va.Code § 5.1–156(B) (stating that the MWAA is independent of Virginia and its local subdivisions, the District of Columbia and the federal government, with respect to the agency's "performance and exercise of the airport-related duties and powers. . . .").

**14.** The Virginia MWAA Act empowers the MWAA to "construct or permit construction of commercial and other facilities . . . upon the airport property *on terms established by the Authority*." Va.Code § 5.1–156 (emphasis added). The statute goes on to give the MWAA the power to "adopt, amend, and repeal rules and regulations pertaining to use, maintenance, and operation of its facilities;" the definition of "facilities" includes their construction. Va.Code §§ 5.1–157, 152.

**15.** The MWAA has adopted a "Contracting Policies and Procedures Manual" ("Manual"). *MWAA Contracting Policies and Procedures Manual*, § 3.10.7. The Fourth Circuit recently held that the MWAA is bound to comply with the terms of the Manual, because it was adopted "expressly for the purpose of fulfilling its legislative and lease requirements for published competitive procedures." *Washington–Dulles Transportation, Ltd. v. Metropolitan Washington Airports Authority*, 263 F.3d 371, 374 (4th Cir.2001). The Manual provides that "upon the award of any construction contract exceeding $100,000 to any prime contractor, such contractor shall furnish to the [MWAA] the performance and payment bonds . . . from an approved surety." *Id.* Similar to the purpose of the Miller Act and the Little Miller Act, the MWAA regulation exists for the protection of claimants who supply labor or materials to the prime contractor or subcontractors. *See id.*

*Authority,* 263 F.3d 371, 373–77 (4th Cir. 2001). There, a disappointed bidder for the provision of taxi services at Washington–Dulles International Airport was allowed to sue the MWAA on the ground that the MWAA had not adhered to its own procurement practices published in its Contracting Manual. *Id.,* at 376. The Fourth Circuit held that the MWAA's procurement practices, which include project bond requirements, are governed not by Virginia or District of Columbia law, but instead by the terms of the MWAA's lease with the Department of Transportation. *Id.,* at 373–77. In reaching this conclusion, the Fourth Circuit relied on the fact that both Virginia and the District of Columbia statutorily exempted the MWAA from their respective procurement laws. *Id.,* at 376. Thus, although *Washington–Dulles Transportation* did not directly address the applicability of the Little Miller Act to the MWAA, it squarely held that the VPPA, which includes the Little Miller Act, is inapplicable to the MWAA and its construction projects. *Id.*

As it did with the federal Miller Act, BKELP again attempts to avoid this result by arguing that the MWAA's statutory exemption from the VPPA, and hence the Little Miller Act, applies only to the MWAA and not to contractors on MWAA projects. *See Redman Corp. v. John C. Grimberg, Co.,* 1998 WL 972249, *2 (Va. Cir. Ct. June 19, 1998) (holding that the MWAA's VPPA exemption did not explicitly exempt general contractors and subcontractors on projects on property owned by the MWAA). As was the case regarding the federal Miller Act, BKELP's argument in this regard ignores the correlative nature of the duties imposed by the Little Miller Act. Because the Little Miller Act imposes both a duty on the state agency to require a bond as a condition to awarding a contract, and a correlative duty on the contractor to obtain a bond as a condition of qualifying for a contract, it is nonsensical to speak of the Little Miller Act's applicability to contractors, but not to the MWAA.[16] Since the MWAA is plainly exempt from the Little Miller Act's requirements, it follows that contractors with the MWAA are not required to furnish bonds pursuant to the Little Miller Act.[17]

In sum, the Little Miller Act is not applicable to the MWAA Project at the Airport because the Virginia MWAA Act exempts the MWAA from the Little Miller Act's requirements.

## C.

It is worth noting that the result reach here—the dismissal of Counts I and II on grounds that the Miller Act and the Little Miller Act are not applicable to the MWAA's Project—may not ultimately prove to be consequential to BKELP. This is so because San Jose, as required by the MWAA's regulations, obtained a payment bond from AHAC for the protection of Project subcontractors and materialmen, including BKELP. *See* Part B, *supra,* note 15. And, because AHAC and BKELP are citizens of different states, BKELP may proceed in federal court, as it has here in Count III, on a breach of

---

16. *See* Part A, *supra,* n. 6.

17. Moreover, exempting only the MWAA from the Little Miller Act requirements, but requiring all other parties (i.e. contractors and subcontractors) to comply with the law, would create conflicting obligations. For example, the MWAA regulations provide that upon achieving substantial completion of the construction contract, the MWAA Contracting Officer may consider reducing the bond requirement from 100% to 50% unless there is good and sufficient reason not to do so. *MWAA Contracting Policies and Procedures Manual,* § 3.10.7, "Performance, Payment, and Bid Bonds." The Little Miller Act does not have this provision. Va.Code § 2.2–4337.

contract claim against the bond. Of course, nothing in this memorandum opinion expresses, or is intended to express, any view as to the merits of such a claim or the merits of any other claim BKELP may assert.

## III.

For these reasons, defendant's motion to dismiss Counts I and II of the complaint must be granted. An appropriate order will issue.