**BLUMENTHAL–KAHN ELECTRIC LTD. Partnership, Plaintiff,**

v.

**AMERICAN HOME ASSURANCE CO., Defendant.**

**American Home Assurance Co., Third-party plaintiff,**

v.

**City General, Inc., Third-party defendant,**

and

**Gulf Insurance, Co., Third-party defendant.**

No. CIV.A. 02–743–A.

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 5, 2002.

Thomas Moore Lawson, Lawson and Silek P.L.C., Winchester, VA, for Plaintiffs.

Douglas Clark Proxmire, Patton Boggs L.L.P., Washington, DC, for Defendants.

John T. Donelan, Law Offices of John T. Donelan, Alexandria, VA, Michael Philip Marchetti, Greenburg Spence & Taylor L.L.C., Rockville, MD, for Cross–Claimants.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this dispute arising out of a construction project at Ronald Reagan National Airport ("Project"), an electrical subcontractor sued on the general contractor's bond to recover for the work and materials it expended on the Project. The matter came before the Court on defendant, American Home Assurance Co.'s ("AHAC") motion to stay all further proceedings pending arbitration, pursuant to § 3 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* For the reasons that follow, AHAC's motion was granted.

### I.

On August 17, 1999, San Jose Construction Group ("San Jose") entered into a contract ("Prime Contract") with the Metropolitan Washington Airports Authority ("MWAA") to complete a pedestrian tunnel as part of the Project. This contract in-

cludes an arbitration provision.[1] On or about August 12, 1999, AHAC provided a payment bond to San Jose for the Project. Paragraph 1 of the payment bond provides that the "Construction Contract," *i.e.* the Prime Contract, is "incorporated herein by reference."

On November 12, 1999, following award of the Prime Contract, San Jose entered into a subcontract with City General, Inc. ("CGI") to procure labor and materials to complete the electrical work for the project ("San Jose–CGI subcontract"). Article 11c of this subcontract states:

> To the extent not resolved under Article 11a or b...any dispute between San Jose and Subcontractor, shall, at San Jose's sole option, be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. If San Jose elects to arbitrate, then the arbitration shall be in Washington, DC. The foregoing agreement to arbitrate shall be specifically enforceable in any court of competent jurisdiction. Upon its request, San Jose shall be entitled to con-

solidation or joinder of any arbitration involving Subcontractor with related arbitrations involving other parties.

Also pertinent here is Article 19a of this subcontract, which states:

> All lower-tier subcontractors and purchase orders awarded by Subcontractor are subject to the provisions of this Subcontract, and Subcontractor shall insert in Subcontractor's subcontracts all provisions required by the Contract Documents or necessary to enable Subcontractor to comply with the terms hereof. Subcontracting by Subcontractor shall not abrogate any obligation of Subcontractor under this Subcontract.

On December 28, 1999, as required by the San Jose–CGI subcontract, CGI obtained a payment bond and performance bond from Gulf Insurance ("Gulf").[2] Under the terms of the performance bond, in the event that CGI defaults, *i.e.* fails to perform according to the terms of its subcontract with San Jose, Gulf is required to arrange for the completion of the subcontract. And further, should Gulf fail to

---

1. The arbitration provision in the Prime Contract states that if the amount of the disputed claims is less than $300,000, arbitration will occur provided the contractor (San Jose) furnishes a

    written request for non-binding mediation or binding arbitration to the Contracting Officer [at the MWAA] and the [MWAA] consents to mediation or arbitration of the issue(s). The [MWAA] will not unreasonably withhold its consent.

    If the [MWAA] consents to arbitration, the contractor [San Jose] may file a demand for arbitration with the American Arbitration Association....If the [MWAA] does not consent to arbitration or mediation of the dispute, the contractor may choose to pursue resolution of the dispute by a court of competent jurisdiction within the Commonwealth of Virginia.

    However, if the total amount of disputed claims exceeds $300,000, the following provision applies:

    After submission of a formal and complete claim for equitable adjustment of contract price or schedule, the Contracting Officer [of MWAA] will issue a written final decision on the claim. The contractor [San Jose] may institute litigation to resolve the dispute....Contract provisions consistent with the foregoing will be inserted in [MWAA] procurement contracts. Nothing prohibits the [MWAA] from agreeing to mediation or arbitration of a disputed claim exceeding $300,000 if the [MWAA] deems it to be in its best interest to do so.

2. Under the terms of the payment bond, in the event that CGI fails to pay its subcontractors, Gulf is required to pay or arrange for their payment. This payment bond incorporates the terms of the CGI subcontract, including the arbitration provision, by reference.

perform this obligation under the performance bond, Section 5 of that bond provides that San Jose is "entitled to enforce any remedy available to [itself]" against Gulf. Significantly, Section 1 of the performance bond incorporates, by reference, all of the terms of the San Jose–CGI subcontract, including the arbitration provision.

Thereafter, on March 20, 2000, CGI entered into a subcontract with Blumenthal-Kahn Electric Ltd. Partnership ("BKELP"), whereby BKELP would provide field engineering and administrative management in support of CGI's electrical work on the Project ("CGI–BKELP subcontract").[3] Article 6.1 of this subcontract also included a provision requiring that:

> [a]ny controversy or claim between the Contractor [CGI] and Subcontractor [BKELP] arising out of or related to this Subcontract, or the breach thereof, shall be settled by arbitration, which shall be conducted in the same manner and under the same procedure as provided in the [San Jose–CGI subcontract] with respect to claims between [San Jose and CGI], except that a decision by the Architect shall not be a condition precedent to arbitration. . . .

A helpful schematic of the parties and their relationships is attached as an Exhibit to this Memorandum Opinion.

During the course of the Project, CGI encountered difficulty completing its scope of work by the Project completion date.[4]

As a result, San Jose halted payments to CGI in December 2000, and CGI, in turn, was unable to pay its subcontractors and suppliers, including BKELP. A month later, San Jose threatened to terminate CGI from the Project. In an effort to complete the Project in accordance with the original schedule and to avoid CGI's termination, San Jose, in January 2001, directed BKELP to provide labor to perform additional electrical work on the Project, work BKELP claims was outside the scope of the CGI–BKELP subcontract. Additionally, on March 15, 2001, on San Jose's demand, CGI issued an open purchase order to BKELP for additional labor to be directed by San Jose. Ultimately, BKELP provided the necessary labor, materials, and management that substantially completed its original contractual obligations to CGI and the additional work required by San Jose.

On May 23, 2002, BKELP filed this federal complaint against AHAC on the payment bond, alleging that both CGI and San Jose had failed to pay BKELP for work done on the Project and were therefore in breach of their agreements with BKELP. A substantial portion of BKELP's claim against AHAC is for labor and materials supplied in accordance with the March 15, 2001 purchase order from CGI. The complaint alleged five counts, and sought damages in the amount of $785,199.03.[5]

---

3. AHAC contends that this relationship was in fact a joint venture partnership.

4. BKELP alleges that MWAA's engineering documents were incomplete and inaccurate, and could not be relied upon for completion of the Project. In response to CGI's requests for clarification of the documents, MWAA made substantial changes to the original plans, but required San Jose and its contractors to adhere to the original Project completion date. While CGI had sufficient resources to perform the work under the original engi-

neering documents in a timely manner, it was unable to accommodate MWAA's changes to the plans and still complete its scope of work in accordance with the original schedule.

5. Count I sought recovery against the bond under the federal Miller Act, 40 U.S.C.A. §§ 270a, 270b, Count II sought the same relief under Virginia's counterpart to the federal Miller Act, commonly referred to as the "Little Miller Act," Va.Code § 2.2–4337 et seq., Count III was for breach of contract, Count IV for specific performance, and Count V for

On June 27, 2002, AHAC filed an answer to BKELP's complaint. On the same day, it also filed a third-party claim against CGI, which CGI answered. On August 13, 2002, AHAC also filed a third-party complaint against Gulf, which Gulf, in turn, answered. On June 27, 2002, AHAC filed two motions to dismiss BKELP's complaint, which the Court granted with respect to Counts I (Miller Act) and II (Little Miller Act) on September 4, 2002. *See United States for the Use of Blumenthal–Kahn Electric, Ltd. Partnership v. American Home Assurance Co.,* 219 F.Supp.2d 710 (E.D.Va.2002). On September 12, AHAC filed a motion to dismiss for failure to join an indispensable party (San Jose), which the Court denied on September 27, 2002. *See Blumenthal–Kahn Electric, Ltd. Partnership v. American Home Assurance Co.,* No. 02–743–A (E.D.Va. September 27, 2002) (Order).

Although the matter has been pending in litigation for only six months, and no trial date set, discovery is largely completed, with the parties having exchanged documents and taken depositions of the various party representatives. Some additional depositions are scheduled for the near future.

On October 30, 2002, and again on November 1, 2002, approximately five months after BKELP filed its initial complaint, AHAC advised all parties of its election to resolve this matter through arbitration. On October 31, 2002 and again on November 5, 2002, BKELP rejected AHAC's requests for arbitration. On November 1, 2002, Gulf advised that it was not opposed to resolving this matter through arbitration, yet thereafter retracted its consent on November 13, 2002. On November 4, 2002, CGI advised AHAC that it also opposed resolving this matter through arbitration.

On November 7, 2002, AHAC filed a motion to compel arbitration and stay the proceedings pending arbitration. This motion, having been fully briefed and argued, was decided in a bench ruling granting the motion, compelling arbitration, and staying the case pending completion of the arbitration. *See Blumenthal–Kahn Electric, Ltd. Partnership v. American Home Assurance Co.,* No. 02–743–A (E.D.Va. November 21, 2002) (Order).

This Memorandum Opinion records the reasons for the bench ruling. At issue on AHAC's motion to compel arbitration are three questions: (i) whether the matter falls within the parameters of the arbitration clauses; (ii) whether AHAC, a non-signatory to the contracts containing the arbitration clauses, can compel BKELP, CGI, and Gulf, all three signatories to those contracts, to submit the matter to arbitration; and, (iii) whether AHAC, through its litigation activity, has waived its right to arbitration. Each question is separately addressed.

**II.**

**A.**

A strong federal policy favors arbitration of disputes. In the words of the Supreme Court, the Federal Arbitration Act "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *American Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 92 (4th Cir.1996) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74

bad faith refusal to make payment on the bond.

L.Ed.2d 765 (1983)). Accordingly, "the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." *Id.* (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,* 867 F.2d 809, 812 (4th Cir.1989)). Courts should not deny requests to arbitrate an issue "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

■ This heavy presumption in favor of arbitrability, however, does not apply to the issue of which claims are arbitrable. *See Carson v. Giant Food, Inc.,* 175 F.3d 325, 329 (4th Cir.1999). The Supreme Court has advised that courts "should not assume that the parties agreed to arbitrate arbitrability." *Id.* (quoting *First Options of Chicago v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). While parties can agree to let an arbitrator determine the scope of his own jurisdiction, and decide which disputes the parties had agreed to arbitrate, such an intention must be "clearly and unmistakably" unambiguous. *See id.* (citing *AT & T Technologies Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). Accordingly, courts do not consider broadly worded arbitration clauses, such as "should any dispute arise between the parties[,] they agree to seek resolution through arbitration," to encompass an agreement to arbitrate arbitrability of disputes. *See id.* Thus, the general rule is that "whether particular disputes are arbitrable under a contractual arbitration clause are questions for the court to decide as a matter of contract interpretation." *Virginia Car-*

*olina Tools, Inc. v. Int'l Tool Supply, Inc.,* 984 F.2d 113, 117 (4th Cir.1993).

■ When these principles are applied to each of the claims in issue, it is apparent that each falls within the relevant arbitration clauses. First, BKELP's suit against AHAC essentially involves BKELP's disputes with CGI and with San Jose growing out of the Project. The issue, therefore, is whether BKELP's agreements with CGI and San Jose include arbitration provisions. The arbitration clauses contained in the San Jose–CGI subcontract and the CGI–BKELP subcontract are unambiguously broad, and clearly encompass BKELP's disputes with both CGI and San Jose. With respect to BKELP's dispute with CGI, the San Jose–CGI subcontract provides that all lower-tier subcontractors (*e.g.,* BKELP) and "purchase orders awarded by [CGI]" (*e.g.,* the purchase order awarded by CGI to BKELP) are "subject to the provisions of [the San Jose–CGI] subcontract," which, of course, includes a broad arbitration provision. Additionally, the CGI–BKELP subcontract states that "any controversy or claim" between CGI and BKELP "arising out of or related to this subcontract, or breach thereof, shall be settled by arbitration...." Accordingly, BKELP's dispute with CGI, regarding CGI's failure to compensate BKELP for work performed under the CGI–BKELP subcontract and the purchase order falls squarely within the parameters of both the San Jose–CGI and CGI–BKELP subcontracts.

■ BKELP's dispute with San Jose is also covered by the arbitration clause in the San Jose–CGI subcontract. This dispute arises out of BKELP's claim that San Jose directed BKELP to provide electrical work outside the scope of the CGI subcontract with San Jose. Notably, AHAC, on behalf of San Jose, denies the existence of this relationship. But assum-

ing, *arguendo*, that such a relationship existed, BKELP would be bound to arbitrate disputes growing out of the relationship owing to its status as a lower-tier subcontractor. Under the San Jose–CGI subcontract, "all lower-tier subcontractors and purchase orders awarded by [CGI] are subject to the provisions of [the San Jose–CGI] subcontract," which requires San Jose's subcontractors (*e.g.*, BKELP) to arbitrate "any disputes" they have with San Jose. Thus, it is appropriate to bind BKELP to the arbitration clause contained in the San Jose–CGI subcontract. As a result, BKELP's dispute with San Jose, regarding San Jose's alleged failure to compensate BKELP for work performed for San Jose, falls within this broad arbitration clause.

■ AHAC's third party claims, on behalf of San Jose, against CGI and Gulf also fall within the arbitration provisions in the relevant subcontracts and performance bond.[6] First, San Jose's dispute with CGI is within the scope of their subcontract, which compels arbitration for "any dispute" between the two entities. Second, San Jose's dispute with Gulf is governed by the terms of the performance bond issued by Gulf, which incorporates by reference the terms of the San Jose–CGI subcontract. Also, the performance bond grants San Jose the power "to enforce any remedy available to [itself]" against Gulf. One of these remedies is San Jose's right, under its subcontract with CGI, to compel arbitration of disputes. While the literal terms of that arbitration provision are confined to disputes between San Jose and its subcontractor, there is also strong federal policy favoring arbitration of disputes that compels courts to interpret broadly the scope of arbitration clauses. *See, e.g. American Recovery*, 96 F.3d at 92 (citing

*Gulf Navigation*, 363 U.S. at 582–83, 80 S.Ct. 1347). The more restrictive, literal, interpretation would render San Jose's remedies clause in the Gulf performance bond meaningless, as *all* of San Jose's other remedies under its subcontract with CGI are written in terms of resolving disputes with CGI. Accordingly, it is sensible to interpret San Jose's remedies under the Gulf performance bond to include arbitration of its disputes with Gulf. As a result, San Jose's dispute with Gulf falls within the scope of the broad arbitration clause in the CGI subcontract, which compels arbitration of "any dispute" with San Jose.

In sum, all of the claims in issue—*i.e.* BKELP's claim against AHAC, and AHAC's claims against CGI and Gulf—fall squarely within the broad arbitration clauses contained in the San Jose–CGI subcontract and the CGI–BKELP subcontract.

## B.

The next step in the analysis is to address the question whether AHAC, a non-signatory to the San Jose–CGI subcontract, the CGI–BKELP subcontract, and the Gulf performance bond, can invoke the arbitration clauses of those contracts to compel signatories BKELP, CGI, and Gulf to arbitrate.

Although there is no factually identical authority, this question is nonetheless controlled by a number of decisions in which the Fourth Circuit has essentially estopped, in analogous circumstances, a signatory from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are governed by an agreement containing an arbitration clause signed by that signatory.[7] The *Rhone Poulenc* case is

---

6. AHAC's ability to compel arbitration on behalf of San Jose is discussed *infra* Part B.

7. *See J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir.

both instructive and controlling here. There, the Fourth Circuit allowed a non-signatory, parent company to compel the signatory plaintiff to submit its contract dispute to arbitration even though that dispute arose from a contract the plaintiff had with a subsidiary of the parent company, which included an arbitration clause. *See J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir.1988). The Fourth Circuit based its decision on the fact that the signatory's claims against the parent company and its subsidiaries were "based on the same facts and [were] inherently inseparable," because the parent company was ultimately liable for the debts of the subsidiary. *See id.* Thus, a parent company should be allowed to stand in its subsidiary's shoes, and invoke the arbitration clause contained in a contract the subsidiary signed with the plaintiff. Otherwise, "if the parent company was forced to try the case, the [subsidiary's right to have the case resolved in] arbitration...would be rendered meaningless, and the federal policy in favor of arbitration effectively thwarted." *Id.* (citing *Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976)).

Similarly compelling and controlling is *Long v. Silver. See Long v. Silver*, 248 F.3d 309, 320 (4th Cir.2001). There, the plaintiff sued both a corporation and its shareholders for breach of an employment contract, which contained an arbitration clause. Both the corporation and its shareholders sought to invoke that clause and compel arbitration. In opposition, the plaintiff argued that the shareholders were precluded from relying on the arbitration clause because they were not signatories to his employment contract. The Fourth Circuit rejected this argument on two grounds. First, the court pointed out that the plaintiff's facts and claims against the corporation and its shareholders were "so closely intertwined" that his claims against the shareholders "are properly referable to arbitration." *Id.* This was so because a judgment against the corporation was essentially one against its shareholders, who would ultimately bear the cost. If the shareholders were compelled to litigate their claim under the contract, the corporation's right to invoke the arbitration clause would be "rendered meaningless." *Id.* Second, the court held that plaintiff was equitably estopped from seeking to claim the benefit from the employment contract, while, "simultaneously attempting to avoid the terms of an arbitration provision contained therein." *Id.*

■ These sensibly settled principles, applied here, point persuasively to the conclusion that AHAC may properly invoke the arbitration clauses in the various subcontracts and compel BKELP, CGI, and Gulf to arbitrate their disputes. As was the case in *Long*, the claims BKELP is seeking to vindicate against AHAC are "based on the same facts and are inherently inseparable" from the claims BKELP would have against San Jose, the signatory to the San Jose–CGI subcontract (which is incorporated by reference in the CGI–BKELP subcontract). *See Long*, 248 F.3d at 320 (quoting *Rhone Poulenc*, 863 F.2d

1988); *Long v. Silver*, 248 F.3d 309, 320 (4th Cir.2001). *See also Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir.2000) (holding that "well-established common law principles dictate that in an appropriate case, a non-signatory can enforce...an arbitration provision within a contract executed by other parties");

*Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757–58 (11th Cir.1993) (holding that when a signatory's claims against a non-signatory were "intimately founded in and intertwined with" a contract containing an arbitration clause, the signatory was estopped from refusing to arbitrate those claims).

at 320–21). Thus, BKELP is seeking to recover payment for work it performed for CGI and San Jose, payment that AHAC guaranteed. Moreover, AHAC's claims against CGI and Gulf are similarly "based on the same facts and are inherently inseparable" from claims San Jose would have against CGI and Gulf. *See id.* AHAC is seeking recovery from CGI and Gulf for all amounts BKELP seeks against AHAC, and for the amount San Jose paid to complete the CGI subcontract when CGI and Gulf defaulted.

Significant here is the relationship between a principal (San Jose) and a surety (AHAC), which is similar, in relevant respects, to that of a corporation and its shareholders (*Long*), and a parent company and its subsidiary (*Rhone Poulenc*). In each of these relationships, one party signed a contract containing the arbitration obligation, while a related non-signatory may bear the ultimate burden for the payment of judgments.[8] In this case, the principal (San Jose) and its surety (AHAC) are in privity. *See Board of Supervisors of Fairfax Cty. v. Southern Cross Coal Corp.*, 238 Va. 91, 380 S.E.2d 636, 639 (1989). The "surety's liability to the obligee is measured by that of the principal.... Where a surety's liability for the principal's obligation has been established, the surety is liable for the whole debt." *Id.* For that reason, a surety steps in the shoes of the principal, and "the defenses

available to both may be asserted by either." *Id.* Accordingly, if AHAC is not allowed to invoke San Jose's right to arbitrate its disputes with BKELP, CGI and Gulf, and is instead required to resolve these disputes through litigation, then San Jose's arbitration right is "rendered meaningless." *See Rhone Poulenc*, 863 F.2d at 320–21.

Moreover, the principle of equitable estoppel compels the conclusion that BKELP should be required to arbitrate its claims against AHAC. Simply put, it would be inequitable to allow BKELP to reap the benefits of its subcontract with CGI and the San Jose–CGI subcontract, while "simultaneously attempting to avoid the terms of an arbitration provision contained therein." *See Long*, 248 F.3d at 320.

### C.

The waiver issue is the final question to be addressed in the arbitration analysis. Under 9 U.S.C. § 3 of the Federal Arbitration Act, a party "may demand a stay of federal judicial proceedings pending exercise of a contractual right to have the subject matter of the federal action decided by arbitration, unless the party seeking arbitration is 'in default' of that right." *Maxum Foundations, Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir. 1985).[9] The Fourth Circuit has explained

---

**8.** AHAC can later seek indemnification from San Jose for whatever amount AHAC may ultimately be required to pay BKELP and CGI under the payment bond. BKELP, CGI, and Gulf are contractually obligated to arbitrate all disputes with San Jose under their subcontracts. If this matter were not allowed to proceed to arbitration, and were instead determined in this litigation, the resulting judicial determination would form the basis of AHAC's indemnification action against San Jose. Thus, in order to give effect to BKELP, CGI, and Gulf's agreement with San Jose to arbitrate all disputes, it is sensible to require

BKELP, CGI, and Gulf to arbitrate the disputes with AHAC.

**9.** 9 U.S.C. § 3 states that:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has

that while "the principle of 'default' is akin to waiver, the circumstances giving rise to a statutory default are limited and, in light of the federal policy favoring arbitration, are not to be lightly inferred." *Id.; see also MicroStrategy, Inc. v. Lauricia,* 268 F.3d 244, 249 (4th Cir.2001); *American Recovery,* 96 F.3d at 96. Default or waiver in this context occurs when a party has "so substantially utiliz[ed] the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." *Maxum,* 779 F.2d at 981. In other words, waiver of the right to compel arbitration is triggered not by commencing or pursuing litigation, or by engaging in or indeed, even completing, discovery; instead, the trigger for waiver is the occurrence of actual prejudice to the party resisting arbitration. In the Fourth's Circuit's words, "the dispositive question is whether the party objecting to arbitration has suffered *actual prejudice.*" *MicroStrategy,* 268 F.3d at 249 (citing *Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc.,* 817 F.2d 250, 252 (4th Cir. 1987)) (emphasis added). And significantly, it is the party opposing the stay who "bears the heavy burden of proving waiver." *American Recovery,* 96 F.3d at 95.[10]

■ These principles lead to the conclusion that it is appropriate to compel arbitration in this case. This is so because even though the parties have engaged in substantial discovery, BKELP, CGI, and Gulf have failed to specify or demonstrate the requisite actual prejudice suffered from any delay in AHAC's request for arbitration.

Fourth Circuit precedent makes clear that "neither delay nor the filing of pleadings by the party seeking a stay will suffice" to constitute waiver.[11] To be sure,

been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

BKELP contends that AHAC waived the applicability of *any* federal law when AHAC argued that the Federal Miller Act did not apply to this case because the MWAA was not a federal entity. BKELP's argument misunderstands the court's Memorandum Opinion. The Federal Miller Act did not apply because that Act, by its terms, only applied to "public buildings and works of the United States." The MWAA was not such a public building. By contrast, the language of the Federal Arbitration Act is broad, and encompasses the case at bar: this Act applies to "any suit or proceeding...brought in any of the courts of the United States." *See* 9 U.S.C. § 3. BKELP's lawsuit against AHAC appears to fall within this category.

10. The Fourth Circuit has cited the Second Circuit's holding in *Leadertex,* which held that the "[pursuit of] various avenues of discovery [before seeking arbitration]," does not automatically compel the conclusion that the plaintiff was prejudiced. *MicroStrategy,* 268 F.3d at 249 (citing *Leadertex Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 26 (2d Cir.1995)). Indeed, the Fourth Circuit has

also cited the First Circuit for the proposition that even when the party asking for arbitration has "acted inconsistently with its right to arbitration by initiating litigation and participating in discovery on arbitrable claims," a court should nonetheless find no waiver if the party opposing arbitration has failed to establish prejudice. *Id.* (citing *J & S Constr. Co. v. Travelers Indem. Co.,* 520 F.2d 809, 809–10 (1st Cir.1975)). Thus, the party opposing the stay must make a showing of actual prejudice, not rely on the mere speculation of prejudice.

11. *See MicroStrategy,* 268 F.3d at 250 (delay of six months, filing of more than 50 "motions, responses, and other procedural maneuvers" did not constitute waiver); *Maxum,* 779 F.2d at 982 (delay of three months, taking of depositions, and exchanging interrogatories and document production requests did not constitute waiver); *American Heart Disease Prevention Foundation, Inc. v. Hughey,* 106 F.3d 389 (Table), 1997 WL 42714 (4th Cir.1997) (no waiver found despite delay of 16 months, during which time the parties engaged in substantial discovery and litigated to resolution motions to change venue and disqualify an expert witness).

delay and the extent of the moving party's trial-oriented activities are "material factors in assessing a plea of prejudice." *MicroStrategy*, 268 F.3d at 248. Yet, in this case, there has been no showing that the five to six months in litigation resulted in any actual prejudice to CGI, BKELP, or Gulf. Instead, the facts here are far removed from those cases where waiver has been found. For example, the Fourth Circuit has found that the following activities constituted sufficient prejudice on the party opposing the stay to constitute waiver: (i) a delay of 4½ years; (ii) the exchange of interrogatories and requests for document production; (iii) the noticing of at least 35 depositions; (iv) the filing of eight discovery motions, two motions in limine, one motion for partial summary judgment, and three motions to dismiss; (v) the participation in four status conferences, five hearings on pending motions, two pretrial conferences; and (vi) the setting and cancelling of two trial dates. *Fraser v. Merrill Lynch Pierce, Fenner & Smith*, 817 F.2d 250, 252 (4th Cir.1987). These facts stand in sharp contrast to the much shorter delay and lesser litigation activity in this case.

The absence of waiver in this case is further illustrated when the facts of this case are compared to those in *MicroStrategy*, where the Fourth Circuit found that the obtaining of discovery and the taking of depositions did not constitute prejudice to the party opposing the stay (in that case the defendant). If the amount of litigation in *MicroStrategy* did not result in actual prejudice or waiver, then the same result, *a fortiori*, should obtain in this case. Thus, the court in *MicroStrategy* held that the party opposing the stay had the burden to demonstrate exactly what prejudice it had suffered from the exchange of information through discovery that would be unavailable to the opposing party in arbitration. In that case, the defendant had "made no effort to establish what discovery would or would not be available to [the plaintiff] in an arbitration proceeding. Instead, [the defendant] simply assert[ed] that discovery is unavailable in arbitration and...therefore [she was] prejudiced by the fact that the [plaintiff] obtained some discovery before seeking arbitration." *MicroStrategy*, 268 F.3d at 251. Accordingly, the court found that the defendant had not met her "heavy burden" to show prejudice, and consequently, found that there was no waiver of the plaintiff's right to arbitration. *Id.; see also Hughey*, 1997 WL 42714 at *4 (party opposing the stay was unable to identify any prejudicial item turned over in discovery that its opponent would not have been able to obtain in arbitration).

The *MicroStrategy* court also considered in the waiver analysis whether any litigation had taken place regarding arbitrable claims. For example, the *MicroStrategy* court also found persuasive the fact that most of the plaintiff's litigation was in connection to its state-law claims against the defendant, which were not subject to arbitration. Indeed, "[b]ecause these [already litigated] claims [were] distinct, both factually and legally, from [defendant's other, arbitrable,] claims, the litigation surrounding the [non-arbitrable] claims cannot support a finding that [plaintiff] waived a right to arbitrate the unrelated claims." *MicroStrategy*, 268 F.3d at 250. In fact, a party "only invokes the judicial process to the extent it litigates a specific claim it subsequently seeks to arbitrate." *Id.; see also Doctor's Assoc., Inc. v. Distajo*, 107 F.3d 126, 133 (2nd Cir.1997) ("[O]nly prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate.").

■ These principles, applied here, indicate that AHAC has not waived its right to

arbitration through its litigation activities. Significantly, BKELP, CGI, and Gulf have failed to meet their "heavy burden" to show prejudice resulting from the discovery that has already occurred. *See American Recovery*, 96 F.3d at 95. First, the fact that five months have passed between the initial complaint and the invocation of AHAC's right to arbitrate, and AHAC's filing of motions to dismiss, is insufficient to show prejudice to BKELP, CGI, or Gulf. Second, under Fourth Circuit precedent, the obtaining of discovery, including taking depositions, exchanging interrogatories and requests for document production, is also not, by itself, sufficient to constitute waiver. *See supra* note 11 and accompanying text. Most importantly, BKELP, CGI, and Gulf have failed to specify in their pleadings, including BKELP's supplemental brief, exactly what harm they have suffered from AHAC's obtaining information through discovery that it would not have had access to during arbitration.[12] To the contrary, AHAC has demonstrated, without contradiction, that the discovery already undertaken in this litigation would be similar to the discovery available in the arbitration proceeding.[13] *C.f. MicroStrategy*, 268 F.3d at 251 (rejecting defendant's speculation that discovery would not be available in arbitration because her contention was not grounded in evidence). In the end, BKELP, CGI, and Gulf's mere speculation as to the harm they could have suffered is insufficient to demonstrate waiver. *See Hughey*, 1997 WL 42714 at *4 (party opposing the stay

**12.** It is not enough to argue, as BKELP does, that AHAC has "propounded interrogatories, requests for production of documents, and requests for admissions on BKELP regarding the merits of arbitrable claims, all of which have been answered." This argument fails to address Fourth Circuit precedent requiring the showing of prejudice in the form of demonstrating what information BKELP turned over in discovery that would not be available to AHAC during arbitration discovery. *See MicroStrategy*, 268 F.3d at 251 (citing *Fraser*, 817 F.2d at 252 ("The dispositive question is whether the party objecting to arbitration has suffered *actual prejudice*.") (emphasis added)).

**13.** The American Arbitration Association ("AAA") provides procedures for large, complex construction cases, which it defines as involving more than $1,000,000. However, "parties may also agree to use the Procedures in cases involving claims or counterclaims under $1,000,000." *See* AAA Rule L–1. Thus, these rules are not necessarily inapplicable to this case, as BKELP contends. Moreover, AAA Rules L–5.(b)–(c), allow for the

exchange of documents, exhibits and information within such party's control if the arbitrator considers such production to be consistent with the goal of achieving a just, speedy, and cost effective resolution of a Large, Complex Construction case. The parties may conduct such document discovery as may be agreed to by all parties. If the parties cannot agree on document discovery, the arbitrator, consistent with the expedited nature of arbitration, may establish the extent of the same.

The arbitrator, upon good cause shown...may order the conducting of the deposition of, or the propounding of interrogatories to, such persons who may possess information determined by the arbitrator to be necessary to the determination of a Large, Complex Construction case.

Moreover, the AAA Regular Track Procedures also allow for the "production of documents and other information" during arbitration. *See* AAA Rule R–24.(a). However, these procedures also state that "there shall be no other discovery, except as indicated herein or as ordered by the arbitrator in extraordinary cases when the demands of justice require it." *Id.*

Under the AAA Regular Track Procedures, it appears that the parties would only be able to take depositions and exchange interrogatories "in extraordinary cases." However, BKELP has not met its "heavy burden" to show that such circumstances do not exist in this case, and that this type of discovery would not be available in the arbitration of this case. *See American Recovery*, 96 F.3d at 95.

was unable to identify any prejudicial item turned over in discovery that its opponent would not have been able to obtain in arbitration).

Nor is it persuasive, as BKELP argues, that litigation of the Miller Act and Little Miller Act claims caused it sufficient prejudice to constitute waiver. It is true that litigation to a decision of arbitrable claims can result in litigation sufficient to constitute waiver. *See MicroStrategy,* 268 F.3d at 250. But this principle is not applicable here because the jurisdictional issues litigated concerning the Miller Act and the Little Miller Act were not arbitrable issues. Indeed, neither Act plays any role in the resolution by arbitration of the parties' substantive claims. These Acts, which are relevant only to a judicial resolution of the parties' claims, play only the limited roles of (1) providing a basis for federal jurisdiction, in the case of the Miller Act; and, (2) requiring the provision of a bond, in the case of both Acts. *See* 40 U.S.C.A. §§ 270a, 270b; Va.Code § 2.2–4337 *et seq.*[14] These are not arbitrable issues, and AHAC, therefore, has not engaged in substantial litigation over "arbitrable claims" that would constitute waiver.

### III.

For all of these reasons, AHAC's motion to stay the proceedings pending completion of arbitration has been granted.

An appropriate Order has issued. The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

## Exhibit: Relationship of the Parties and Their Claims in this Lawsuit

---

**14.** *See also United States for the Use of Blumenthal–Kahn Electric, Ltd. Partnership v.* *American Home Assurance Co.,* 219 F.Supp.2d 710 (E.D.Va.2002).