11 F.3d 577
 UNITED STATES of America for the Use of GENERAL ELECTRIC
SUPPLY COMPANY, A DIVISION OF GENERAL ELECTRIC
COMPANY, Plaintiff-Appellee,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY; E.H. Hughes
Company, Inc., Defendants-Appellants,
McClain Contracting, Inc., Defendant.
 No. 92-5903.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 6, 1993.
Decided Dec. 7, 1993.
 
 Cary K. Smith (argued and briefed), Frankfort, KY, for plaintiff-appellee.
 Thomas E. Roma, Jr. (argued and briefed), Landrum & Shouse, Louisville, KY, for defendants-appellants.
 Before: MILBURN, RYAN, and BATCHELDER, Circuit Judges.
 BATCHELDER, Circuit Judge.
 
 
 1
 Defendants appeal the district court's granting of summary judgment for the plaintiff in this suit on a surety bond brought under the Miller Act, 40 U.S.C. Sec. 270a. Finding that the district court lacked jurisdiction over the dispute under the Miller Act, we must remand to the district court to determine whether it has jurisdiction under 28 U.S.C. Sec. 1252 or any other federal statute, and, if it does, to reexamine the issues in light of that alternative jurisdictional basis.
 
 I.
 
 2
 On May 11, 1988, the E.H. Hughes Co. (Hughes) entered into a contract with the City of Owenton, Kentucky, to make improvements to the City's wastewater treatment plant. Although federal funding for the project was provided through the Farmers Home Administration (FmHA), the United States was not a party to that contract and did not own the property on which the project was to be constructed. The contract required Hughes to provide a performance bond and a payment bond in the full amount of the contract to secure performance of the work and payment for labor and materials. Hughes supplied the bonds, with United States Fidelity & Guaranty Co. (USF & G) as the surety on the bonds. The bonds named the City of Owenton as the owner, but stated that the bonds ran in favor of both the City and the United States, acting through the FmHA. They also stated that the bonds favored "all persons, firms, and corporations who or which may furnish labor, or who furnish materials to perform as described under the Contract...."
 
 
 3
 At the same time, Hughes entered into a subcontract with McClain Contracting, Inc. (McClain) to furnish and install the electrical equipment required for performance of Hughes's improvements to the City's plant. McClain contracted with General Electric Supply Co. (General Electric) to provide a motor control center for the project, for a price of $29,500.
 
 
 4
 A dispute then arose between General Electric and McClain. McClain claims that General Electric failed to deliver shop drawings on time, that the drawings were deficient when they were submitted, that the equipment provided did not meet the specifications, and that General Electric charged additional amounts for parts that were or should have been included in the original equipment. Hughes and McClain claim that the deficiencies in the equipment supplied by General Electric and the late delivery caused them to suffer substantial damages. General Electric claims that McClain never revoked acceptance of the goods or rejected any materials. General Electric charged McClain more than $65,000 for the equipment, rather than the $29,000 price quoted, claiming that this price difference was caused by change orders made by the City's engineer. McClain paid General Electric (with a joint check from Hughes) $16,991.27 toward these invoices. When McClain did not pay the balance, General Electric sent a notice on May 7, 1990, to McClain, Hughes, and USF & G stating that McClain owed it $44,609.08.
 
 
 5
 In December of 1990, General Electric filed this action against McClain, Hughes, and USF & G, claiming jurisdiction under the Miller Act, 40 U.S.C. Sec. 270a, and alleging that it was owed $47,838.26. Hughes and USF & G filed a motion to dismiss, arguing that the project was not covered by the Miller Act. While that motion was pending, General Electric obtained a default judgment against McClain. On May 3, 1991, the district court denied the motion to dismiss. Hughes and USF & G then filed answers, asserting the defenses of estoppel, failure of consideration, set-off, and payment. Hughes also filed a counterclaim, asserting that it was a third-party beneficiary to the contract between McClain and General Electric, and that Hughes suffered damages because of General Electric's failure to deliver timely and conforming materials.
 
 
 6
 After discovery, General Electric filed a motion for summary judgment. On December 4, 1991, the district court awarded judgment to General Electric for the full balance claimed, with interest and attorneys' fees. The court also found defendants could not bring a counterclaim against GE under the Miller Act. Hughes and USF & G moved to alter or amend the summary judgment; Hughes moved also to set aside the default judgment against McClain and for leave to file an amended answer and counterclaim, claiming that on December 5, 1991, McClain had executed an assignment to Hughes of all McClain's rights, claims, and causes of action arising from the General Electric contract. On June 4, 1992, the district court set aside the default judgment against McClain, finding that the Miller Act gave it no jurisdiction to entertain the claim against that subcontractor, and denied the motion for leave to file an amended answer and counterclaim as being moot. On June 10, 1992, the district court denied Hughes's and USF & G's Rule 59 motion to alter, amend, or vacate summary judgment and amended its order granting summary judgment to General Electric by increasing the attorneys' fees. Hughes and USF & G now appeal.
 
 II.
 
 7
 We must first address defendants' claim that the district court erred in denying their motion to dismiss for lack of jurisdiction over the action under the Miller Act, 40 U.S.C. Secs. 270a, 270b. Finding that the district court did lack jurisdiction under the Miller Act, we do not reach the remaining assignments of error but remand to the district court to determine whether there is an alternative basis for jurisdiction.
 
 A.
 
 8
 Defendants maintain that the district court lacked jurisdiction under the Miller Act because that Act provides a remedy for persons providing labor and materials under contracts "for the construction, alteration, or repair of any public building or public work of the United States." They claim that the Owenton water treatment plant is not a "public building or public work of the United States" despite the federal funding of the project. Plaintiff General Electric, on the other hand, argues that the district court had jurisdiction over the dispute under the Miller Act because, although the project was owned by the City, the FmHA contributed funding to the project under 7 U.S.C. Sec. 1926(a) and the FmHA required Hughes to obtain performance and payment bonds in favor of the City and the United States acting through the Farmers Home Administration.
 
 
 9
 We find that the district court lacked subject matter jurisdiction over this case because the Miller Act does not apply to this local waste-water treatment project. The Miller Act states in pertinent part:
 
 
 10
 Sec. 270a. Bonds of contractors of public buildings or works
 
 
 11
 (a) Type of bonds required
 
 
 12
 Before any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":
 
 
 13
 (1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in such amount as he shall deem adequate, for the protection of the United States.
 
 
 14
 (2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person....
 
 
 15
 40 U.S.C. Sec. 270a(a) (emphasis added). The Act goes on to permit persons furnishing labor and material to sue on the payment bond in federal court.[1] Thus, a laborer or materialman working on a "public building or public work of the United States" who has not been paid in full can sue in federal court on the payment bond required in section 270a.
 
 
 16
 The Miller Act was passed to protect subcontractors and materialmen working on federal projects because state law liens may not be asserted against federally-owned property and, therefore, normal state lien remedies are not available in these cases. In addition, the Act seeks to protect the United States from suits concerning payment of subcontractors and suppliers. United States ex rel. Mississippi Road Supply Co. v. H.R. Morgan, Inc., 542 F.2d 262 (5th Cir.1976), modified on reh'g, 554 F.2d 164 (5th Cir.), cert. denied, 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977). The Supreme Court has stated that the Miller Act is "entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944).
 
 
 17
 The Act does not define "public building or public work of the United States"; the courts, however, have given some guidance on what that phrase means. The typical "garden variety" Miller Act case is one in which the United States both owns the land and contracts for its improvement. Mississippi Road Supply, 542 F.2d at 265. But courts on occasion, recognizing the purposes of the Act, have extended the Act to other situations in which these elements are not present. See id. (citing to situations where title passes to government after construction completed).
 
 
 18
 The Supreme Court has addressed the definition of "public work," although in the context of a National Industrial Recovery Act project. In United States ex rel. Noland Co. v. Irwin, 316 U.S. 23, 62 S.Ct. 899, 86 L.Ed. 1241 (1942), Congress had authorized the construction with federal funds of a library building at Howard University. The Depression put a hold on this project, but after Congress passed the National Industrial Recovery Act, the Secretary of Interior (the administrator of the Recovery Act) approved the library as part of a public-works program to be paid for with federal funds. The U.S. government then entered into an agreement with a contractor to build the library. When a materialman sued on the payment bond required under the contract, the contractor and surety claimed that the building was not a "public work" under the Miller Act. Id. at 27, 62 S.Ct. at 901. The Supreme Court noted that the Miller Act gives "[n]o aid in ascertaining the meaning of 'public works' " but that the Recovery Act defined the term as encompassing " 'any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public.' " Id. at 28, 62 S.Ct. at 901. The Court held that a project can be a "public work" even if the government has no title to the buildings, improvements, or land on which they are situated. Id. at 29, 62 S.Ct. at 902. The Court noted,
 
 
 19
 We have no doubt that the Miller Act was intended to apply to the "public works" authorized by the Administrator under the National Industrial Recovery Act. The National Industrial Recovery Act did not leave to speculation the nature of the "public works" that Congress envisaged. Its language was not technical but plain and specific. Expressly included were "projects of the character heretofore constructed or carried on * * * with public aid to serve the interests of the general public." Beyond question the library at Howard University was such a project.
 
 
 20
 Id. at 30, 62 S.Ct. at 902. While the Irwin Court clearly indicated that title to the land or to the project was not the key, its definition of "public works" equally clearly was limited to the meaning of that term under the Recovery Act and did not extend to projects other than those authorized by the Recovery Act.[2] Thus, the Supreme Court has not defined "public work" as it applies to most potential Miller Act claims.
 
 
 21
 This Court in Peterson v. United States ex rel. Marsh Lumber Co., 119 F.2d 145, 147 (6th Cir.1941), gave a vague definition of "public work" under the Heard Act, the predecessor to the Miller Act. There we said that a "public work" was to be understood in its "plain, obvious and rational sense" and included "any work in which the United States is interested and which is done for the public and for which the United States is authorized to expend funds." Id. at 147. We found that the project for flood control of navigable streams and rivers, funded by the United States, was a "public" project because it was for "the benefit of the public at large" and promoted commerce among the states. Id.
 
 
 22
 Most courts that have addressed the issue have indicated that government funding alone is not enough to make a project a "public work." See Mississippi Road Supply, 542 F.2d at 266 ("existence of government funding alone is not enough"); TIJ Materials Corp. v. Green Island Constr. Co., 131 F.R.D. 31, 33 (D.R.I.1990) (same). What does make a project a "public work" is less clear. The Mississippi Road Supply court stated that the Miller Act applies "either (1) [when] the subcontractors and suppliers of material could assert an action for equitable recovery against the United States or one of its agencies, or (2) [when] normal state labor and material lien remedies are unavailable because of federal ownership of the lands." Mississippi Road Supply, 542 F.2d at 266. The court in that case, to "avoid creating a precedent that would stretch the Miller Act's jurisdictional grant to dimly-lit limits," declined to hold that a federally-funded industrial development park built on land owned by the government and leased to a private organization was a "public work." Id.[3]
 
 B.
 
 23
 In the case before us, the funding for the Owenton waste-water treatment plant improvements was obtained in the form of a loan from the United States through the FmHA, pursuant to 7 U.S.C. Sec. 1926 and FmHA regulations governing loans for the planning, bidding, contracting for and construction of "community facilities." 7 C.F.R. Secs. 1942.17, 1942.18. Among the myriad of regulations contained in those sections is the requirement that the owner of the project furnish performance and payment bonds, each in the amount of 100 percent of the contract cost, running to the owner and, unless prohibited by state law, to the United States through the FmHA as co-obligees. See Sec. 1942.18(n)(3). The payment and performance bonds provided in this case were typed on pre-printed FmHA forms and stated that Hughes as principle, and USF & G as surety, were bound unto the City as Owner and the United States through the FmHA as the Government. The performance bond further provided that the City and the Government, were the only beneficiaries under that bond; the payment bond, however, specifically ran to the Owner, the Government, and "all persons, firms, and corporations who or which may furnish labor, or who furnish materials to perform as described under the contract and to their successors and assigns."
 
 
 24
 The district court looked only to the question of whether the owner in this case furnished bonds running in favor of the United States. Finding that it had, the court apparently reasoned that the Miller Act requires that bonds running to the United States be furnished on projects involving public buildings or public works; this construction project has bonds running to the United States; therefore this construction project involves a public work covered by the Miller Act. The district court cited United States ex rel. Miller v. Mattingly Bridge Co., 344 F.Supp. 459 (W.D.Ky.1972), for this proposition, stating that in that case the court had found that it lacked jurisdiction under the Miller Act because the bonds did not run in favor of the United States, whereas here, they did. The court did not, however, discuss either the facts or the reasoning of Mattingly Bridge.
 
 
 25
 We believe that the district court erred both in its reading of Mattingly Bridge and in its conclusions. The Miller Act requires that if the project is a public work, then the bond must be furnished. But just as the perfectly valid premise that all squirrels have tails does not lead to the conclusion that any animal with a tail is a squirrel, so also the premise that all Miller Act projects must have bonds does not lead to the conclusion that any project with a bond is a Miller Act project. Nor does Mattingly Bridge support such a conclusion. To begin with, Mattingly Bridge did not involve a federal regulation, unrelated to the Miller Act, requiring bonds running in favor of the United States as a condition of funding of the project. Rather, that case involved a construction project in which the United States was not a party to the contract and the bonds ran in favor of the State of Kentucky, which was a party. The court noted that "[t]he performance bond [required by the Miller Act] is for the benefit of the United States, and where there is no contract involving the United States it would need no bond." 344 F.Supp. at 462. However, the court went on to make it very clear that in order for the Miller Act to apply, the United States must be a party to the contract for construction of the project:
 
 
 26
 The plaintiff contends strenuously that the building of an interstate highway is a public project or work contemplated by the Miller Act. The answer to this contention is that this would be true where the United States contracted for the construction of the interstate highway involved, but such is not the case.
 
 
 27
 Id.
 
 
 28
 The parties here do not dispute that the United States does not hold title to either the land or the treatment plant. The United States did not sign the contracts for the construction of the improvements to the treatment plant. The FmHA required, as a condition of the funding, that the planning, bidding, contracting, and construction be subject to the approval of the United States and conform to FmHA regulations, one of which required that the owner furnish payment and performance bonds running in favor of the United States. However, this did not make the United States a party to the contracts, either expressly or impliedly, or give the United States control of the project or impose liability on the United States for actions arising under the contract.[4]
 
 
 29
 In short, we find that the Government is connected to this project only as the funding source. We find the reasoning of the courts in Mattingly Bridge and Mississippi Road Supply to be persuasive and we further find that the purposes of the Miller Act are not served by extending the Act to cases such as this one in which the government was neither the owner nor the intended owner of the property nor a party to the construction contract. We therefore hold that this project is not a "public work of the United States" subject to the Miller Act and the district court lacked jurisdiction over this dispute under that Act.
 
 C.
 
 30
 The plaintiff argues alternatively that the district court had jurisdiction over this matter under 28 U.S.C. Sec. 1352. We remand to the district court to determine whether it has jurisdiction under that statute or under some alternative jurisdictional basis. Because the district court only addressed the claims using a Miller Act analysis and that Act does not apply here, if the district court determines that it does have jurisdiction, the court must then reexamine the plaintiff's claims on this bond in light of the alternative jurisdiction.
 
 III.
 
 31
 For the reasons set out above, we reverse the district court's granting of summary judgment to the plaintiff. We remand to the district court to determine whether there is an alternative basis for jurisdiction such as 28 U.S.C. Sec. 1352, and if there is, to reexamine plaintiff's claims in light of that alternative jurisdiction.
 
 
 
 [1]
 Section 270b of Title 40 states:
 Sec. 270b. Rights of persons furnishing labor or material
 (a) Every person who has furnished labor or material in the prosecution of work provided for in such contract, in respect of which a payment bond is furnished under sections 270a to 270d of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made....
 (b) Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit.... The United States shall not be liable for the payment of any costs or expenses of any such suit.
 40 U.S.C. Sec. 270b.
 
 
 [2]
 We are aware that some courts have applied this definition to other situations. See, e.g., Sullivan v. Faras-RLS Group, Ltd., 795 F.Supp. 305, 306-07 (D.Ariz.1992)
 
 
 [3]
 Several cases have indicated that, at a minimum, the United States must be "a contracting party and that a bond was required in its favor." United States ex rel. Motta v. Able Bituminous Contractors, Inc., 640 F.Supp. 69, 71 (D.Mass.1986); see id. (contractor entered into written contract with U.S. for highway construction, and bonds were issued pursuant to Miller Act); United States ex rel. Miller v. Mattingly Bridge Co., 344 F.Supp. 459, 462 (W.D.Ky.1972) (no Miller Act jurisdiction because U.S. not party to contract and bonds did not run in favor of United States); United States ex rel. Hutto Concrete Co. v. Magna Bldg. Corp., 305 F.Supp. 1244, 1246 (D.Ga.1969) (no Miller Act jurisdiction where government is not owner or vested with title to improvements and bonds do not run to it). But see Sullivan, 795 F.Supp. at 307 (irrelevant that U.S. not a contracting party or named on bond where federal funds used to build building leased to U.S. as Post Office). Courts have found no Miller Act jurisdiction in the following instances: a low-rent housing project neither owned nor administered by federal government, United States ex rel. Kelly's Tile & Supply Co. v. Gordon, 468 F.2d 617 (5th Cir.1972); federal- and state-funded interstate highway project where the U.S. was not a contracting party and not named on bonds, Mattingly Bridge, 344 F.Supp. at 462; a low-rent housing project funded by the U.S., but in which the U.S. did not have an interest in improvements and there was no bond favoring the U.S., Magna Building, 305 F.Supp. at 1245; and a federally funded highway project where the U.S. was not a party to the contract and the bond did not run in favor of it, TIJ Materials, 131 F.R.D. at 34
 
 
 [4]
 See D.R. Smalley & Sons, Inc. v. United States, 372 F.2d 505 (Ct.Cl.), cert. denied, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967), in which the court held that where the United States was not a party to the contracts for certain state highway projects, the fact that the United States provided the funding for those projects and required, as a condition of that funding, that the contracts be drafted pursuant to certain federal regulations and be approved by the government, that the projects meet certain requirements, and that changes in the project be approved by the government, did not make the state the federal government's agent or create any contractual relationship, express or implied, between the United States and the parties to the contracts, or impose liability upon the United States for acts and omissions of the parties who contracted to build the highway projects