Argued and submitted May 19, 2015; on appeal, limited judgment affirmed, appeal of supplemental judgment for attorney fees dismissed and remanded with instructions to vacate that supplemental judgment; on cross-appeal, affirmed September 8, 2016

STATE OF OREGON,
for the use and benefit of
Robert Warren Trucking, LLC,
an Oregon limited liability company; and
Robert Warren Trucking, LLC,
an Oregon limited liability company,
*Plaintiffs-Respondents*
*Cross-Appellants,*

*v.*

SMITH & SMITH EXCAVATION, INC.,
a Washington corporation;
S.U.B.I.; USA Building, Inc.,
a Delaware corporation;
Fidelity and Deposit Company of Maryland,
a Maryland corporation; and
North American Specialty Insurance Company,
a New Hampshire corporation;
*Defendants-Appellants*
*Cross-Respondents,*

*and*

WEST COAST MINING & CRUSHING, INC.,
an Oregon corporation,
*Defendant.*

Tillamook County Circuit Court
122116; A156485

386 P3d 112

Jonathan R. Hill, Judge.

D. Brent Carpenter argued the cause for appellants-cross-respondents. With him on the briefs were Joseph A. Yazbeck, Jr., and Yazbeck, Cloran & Bowser, PC.

Justin Stark argued the cause for respondent-cross-appellant Robert Warren Trucking, LLC. With him on the briefs was Stark Law Office LLC.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

## LAGESEN, J.

Plaintiff Robert Warren Trucking, LLC (Warren) provided rock-hauling services in connection with a construction project for the Port of Tillamook Bay (the Port), but did not receive full payment for those services. That led to this case, in which Warren seeks to collect the unpaid amounts from two payment bonds associated with the Port project. The trial court found in Warren's favor on those bond claims and defendants Smith & Smith Excavation, Inc. (Smith), Skanska USA, Inc. (Skanska), Fidelity and Deposit Company of Maryland, Inc. (Fidelity), and North American Specialty Insurance, Co. (North American) now appeal from a limited judgment for $39,712.85 against them on those claims. They assign error to the trial court's denial of their motions for directed verdicts on the two bond claims, arguing that the trial court erred in concluding that certain amounts were recoverable against the two bonds.[1] Warren has cross-appealed, assigning error to the trial court's computation of damages. For the reasons that follow, we affirm on the appeal and the cross-appeal.[2]

### BACKGROUND

A. *Substantive Facts*

In August 2011, the Port entered into a construction contract with Skanska for the construction of Project 3.2, an industrial business park on Port property. Under the contract, Skanska was the general contractor on the project. As required of successful bidders on a public improvement

---

[1] Warren also asserted breach-of-contract claims and *quantum meruit* claims against Smith, and the trial court found in Warren's favor on those claims. In defendants' joint brief, defendant Smith also assigned error to the trial court's denial of its motion for a directed verdict on Warren's *quantum meruit* claim. At oral argument, however, the parties confirmed that the *quantum meruit* claim was no longer in dispute; as a result, we do not address it further.

[2] Defendants also filed a notice of appeal from the trial court's "supplemental judgment" awarding attorney fees to Warren. However, at the time the trial court entered that judgment, it had not entered a general judgment. As a result, the supplemental judgment is not valid, and we dismiss the appeal from it with directions to the court to vacate the judgment on remand. *Eagle-Air Estates Homeowners Assn., Inc. v. Haphey*, 272 Or App 651, 653 n 2, 354 P3d 766 (2015), *rev den*, 359 Or 166 (2016) (stating process); *Lindsay v. The Nicewonger Co., Inc.*, 203 Or App 750, 757, 126 P3d 730 (2006) (dismissing appeal from invalid judgment with directions to trial court to vacate on remand).

contract by Oregon's Little Miller Act, ORS 279C.380 to 279C.625,[3] Skanska executed and delivered a performance bond and a payment bond to the Port. Fidelity provided those bonds.

Skanska then subcontracted with defendant Smith to perform the initial "sitework and demolition" for the project. Smith's job under the subcontract was, according to its general manager Steven Smith, a "classic cut and cover pad for three large buildings" that required Smith to "clear the site, cut it to subgrade, roll fabric on it, put shot rock over the top of it or jaw-run [rock] and—and go from there." In that contract, Smith agreed to provide the project with, among other things, "[s]tructural excavation and backfill" and

> "all equipment, components, systems, materials * * * required to perform the Work and make it complete, functional and/or operational, notwithstanding the fact that each such service or item may not be expressly mentioned in the Contract Documents."

The contract required that Smith provide a performance bond to secure its performance of its obligations to Skanska under the contract, and a payment bond to secure the payment of its "sub-subcontractors." North American issued those bonds.

As noted, Smith's work for Skanska required it to obtain suitable rock. Specifically, project specifications required Smith to use four-inch and one-inch rock. The Kilchis quarry, which was close to the project site, contained rock suitable for use in the project. To obtain that rock and process it to appropriate size, Smith contracted with defendant West Coast Mining & Crushing, Inc. (West Coast),[4] which operates a portable rock crusher. According to the original agreement between West Coast and Smith, West Coast would arrange for rock to be blasted from the quarry

---

[3] ORS 279C.380(1) generally requires the "successful bidder for a public improvement contract" to "promptly execute and deliver to the contracting agency" two bonds: (1) a performance bond to protect the contracting agency, ORS 279C.380(1)(a); and "[a] payment bond in an amount equal to the full contract price, solely for the protection of claimants under ORS 279C.600," ORS 279C.380(1)(b).

[4] A limited judgment was entered against defendant West Coast, who is not a party to this appeal.

and to be hauled to the project site. At the site, West Coast would set up its portable crusher to crush the blasted rock to the sizes required for the project. The agreement further specified that West Coast would pass the invoices for blasting and hauling to Smith, which would pay them and then deduct those amounts from amounts owed by Smith to West Coast.

West Coast then contracted with Warren, plaintiff in this case, to haul rock from the quarry to the crusher and the project site. During the first week of the project, Skanska alerted West Coast that it would have to comply with prevailing wage rates and also that its employees were required to report to the job site at the beginning of the work day for calisthenics. West Coast had not bid the project as a prevailing wage project, and the requirement that it pay prevailing wages meant that its job for Smith "would have just been a money loser from the get-go." For that reason, after consulting with Smith, West Coast decided to move the crusher off the project site in the hopes of avoiding the wage and calisthenics obligations. It looked for, and found, suitable space on Port property about a half mile from the project site. It then subleased a portion of the property from a person who was leasing it from the Port, and leased another portion of the property directly from the Port.

The decision to move the crusher away from the project site meant that Warren's job of hauling rock to the project site had two legs: (1) hauling unprocessed rock from the quarry to the new crusher site; and (2) hauling crushed rock from the crusher site to the project site. Initially, West Coast told Warren that it would pay for both parts of the haul. Eventually, however, West Coast decided it would no longer pay Warren for hauling rock from the crusher site to the project site, given that the two-legged haul had not been contemplated at the time that West Coast bid on the project, and was not supposed to be part of the job. Smith then notified Warren that Smith would take over the responsibility for paying Warren for the hauls from the crusher to the project site.

Warren hauled unprocessed rock from the quarry to the crusher site until November 19, 2011. However, Warren

hauled the processed gravel from the crusher site to the project site, and performed other hauling activity directly for Smith, through early May 2012. As of that date, Warren was owed $40,426.51 for hauling unprocessed rock from the quarry to the crusher site and $28,813.19 for hauling that it performed for Smith, including hauling from the crusher to the project site.

B. *Procedural Facts*

On June 6, 2012, Warren provided Skanska with a single Notice of Bond Claim. The notice provided that Warren "has a claim for services rendered and/or materials furnished on the * * * project in the sum of $98,750.06." However, the notice did not segregate the amounts attributable to Warren's hauls for West Coast from the amounts attributable to Warren's hauls for Smith. Then, on August 1, 2012, Warren sent an updated Notice of Claim to the Port, Skanska, Smith, and West Coast, which stated that Warren "is owed the principal sum of $95,291.55, plus interest, costs, and fees." Warren attached the unpaid invoices to both West Coast and Smith to the August notice. Finally, on October 5, 2012, Warren filed a complaint in the Tillamook County Circuit Court. Warren's complaint included two bond claims—one against Skanska's bond and the other against Smith's—as well as claims for breach of contract and *quantum meruit* against Smith and West Coast, respectively.

West Coast stipulated to entry of judgment against it on the claims against it, and the case proceeded to trial on the claims against Skanska, Fidelity, Smith and North American. After Warren presented its case, defendants moved for directed verdicts on the bond claims. They argued that (1) the federal Miller Act—not Oregon's Little Miller Act—governed Warren's claim against the Skanska bond and barred Warren's recovery against that bond; (2) Warren was not a proper claimant on either bond; and (3) the Notice of Bond Claim was neither timely nor proper under the Little Miller Act, because Warren "gave notice for both West Coast Mining and Smith & Smith Excavation without any distinction as to which one was * * * appropriate." The trial court denied defendants' motion. Defendants renewed their motion after presenting their case; the trial court again denied it.

After trial, the trial court issued a letter opinion. In it, the trial court found in favor of Warren on all claims, concluding, among other things, that the federal Miller Act did not apply to Warren's claim against the Skanska bond, that Warren timely provided notice of that claim in the manner required by the Little Miller Act, and that Warren was a proper claimant on both the Smith bond and the Skanska bond because of its rock hauling work. The trial court then entered a limited judgment in favor of Warren and against all defendants. After additional briefing, the trial court also entered a supplemental judgment awarding Warren $39,319.33 in attorney fees and costs. Defendants have appealed both judgments.[5] Warren has cross-appealed the limited judgment in its favor.

On appeal, defendants raise eight assignments of error. However, at oral argument, the parties agreed that the issues before us are narrower than the briefs might suggest. The parties clarified that they are challenging the trial court's judgment only to the extent that the trial court found that the approximately $40,000 owed to Warren from West Coast for hauls from the quarry to the crusher is recoverable against the two bonds. As we understand the parties' arguments, the issues before us on appeal are, to the extent Warren's claims were for amounts owed for the quarry-to-crusher hauling, (1) whether defendants were entitled to a directed verdict on the claim against the Skanska bond on the ground that the federal Miller Act applies and bars Warren's claim; (2) if Oregon's Little Miller Act applies to Warren's claim against the Skanska bond, whether defendants were entitled to a directed verdict on that claim on the ground that Warren failed to provide timely and proper notice of its claim; and (3) whether defendants were entitled to a directed verdict on the ground that Warren's claim is not covered under the terms of the Smith bond. The issue before

---

[5] In its brief, Warren argues that defendants Skanska and Fidelity did not timely appeal the limited judgment and, as a result, no party is in a position to challenge the court's judgment with respect to Warren's claim against the Skanska bond. But, as defendants point out, once Smith and North American timely filed their notices of appeal, ORS 19.255(3) gave the other parties to the case 10 extra days—40 days from the date the limited judgment was entered—in which to file their notices of appeal if they so desired. ORS 19.255(3). Skanska and Fidelity filed their notices of appeal within that 40-day window and, as a result, are properly before us as appellants.

us on the cross-appeal is whether the trial court erred when it deducted certain amounts from Warren's recovery based upon its determination that Warren had waived recovery or already received credit for those amounts.

## STANDARD OF REVIEW

On appeal, defendants assign error to the trial court's denial of their motions for directed verdicts on the two bond claims. In reviewing the denial of a motion for a directed verdict, we consider the whole record, *Kilgore v. People's Savings & Loan Ass'n*, 107 Or App 743, 746, 814 P2d 163 (1991), *rev dismissed*, 313 Or 300 (1992), and we view the evidence, including inferences, in the light most favorable to the party opposing the motion, *Day v. City of Canby*, 143 Or App 341, 345, 922 P2d 1269 (1996). A directed verdict is appropriate only if the moving party is entitled to judgment as a matter of law. *Lindstrand v. Transamerica Title Ins. Co.*, 127 Or App 693, 695, 874 P2d 82 (1994).

## ANALYSIS

### A.  *Skanska Bond*

We first address defendants' claim that the trial court erred in denying their motion for a directed verdict on Warren's claim against the Skanska bond. As noted, defendants contend that they were entitled to a directed verdict on that claim for three different reasons: (1) the federal Miller Act, rather than Oregon's Little Miller Act, governs that bond claim and, under the federal Miller Act, it is undisputed that Warren did not give timely proper notice of its claim; (2) under Oregon's Little Miller Act, if it applies, Warren failed to give timely, proper notice of its bond claim; and (3) under Oregon's Little Miller Act, if it applies, Warren is not a permissible claimant on the Skanska bond for the work that it did hauling rock between the quarry and the crusher.

### 1.  *Is Warren's claim against the Skanska bond governed by federal law or state law?*

The first issue we confront is whether federal law or state law governs Warren's claim against the Skanska bond. Defendants argue that the federal Miller Act, 40 USC

sections 3131 through 3134, governs Warren's bond claim against the Skanska bond. Defendants argue further that, under 40 USC section 3133, Warren failed to give timely and proper notice of its bond claim and that, as a result, the claim fails as a matter of law and defendants were entitled to a directed verdict on it. In response, Warren argues that state law governs its claim and that, as a result, the trial court correctly denied defendants' motion for a directed verdict on the ground that the federal Miller Act barred Warren's bond claim.[6] We agree with Warren.

In arguing that the federal Miller Act governs Warren's claim against the Skanska bond, defendants note that the Port received federal funding for the project. They then argue that ORS 279A.030 makes the federal Miller Act applicable to Warren's bond claim because federal funds were involved in the project: "Therefore, pursuant to the plain language of ORS 279A.030, the federal Miller Act statutes regarding actions on payment bonds apply to the extent that there are conflicts between the Miller Act and the Little Miller Act."

Defendants' argument overlooks the actual text of ORS 279A.030. That statute provides:

> "Except as otherwise expressly provided in ORS 279C.800 to 279C.870, and notwithstanding ORS 279C.005 to 279C.670 and this chapter and ORS chapter 279B, *applicable* federal statutes and regulations govern when federal funds are involved and the federal statutes or regulations conflict with any provision of ORS 279C.005 to 279C.670 or this chapter or ORS chapter 279B, or require additional conditions in public contracts not authorized by ORS 279C.005 to 279C.670 or this chapter or ORS chapter 279B."

ORS 279A.030 (emphasis added). Under the plain text of the provision, two criteria must be satisfied for federal law to apply to a federally funded project under a public contracting project in Oregon: (1) the federal law must be *applicable* to the project; and (2) the federal law must either conflict with

---

[6] Warren does not appear to dispute the proposition that, if federal law applies, defendants would be entitled to a directed verdict on the claim against the Skanska bond.

state public contracting law, or impose additional requirements that are not authorized by state law.

Here, defendants have not demonstrated that the first criterion is satisfied. They have provided us with no authority for the proposition that the federal Miller Act is "applicable" to the Port project at issue in this case. And, as the trial court correctly recognized, available authority points to a contrary conclusion.

First, the statutory text of the federal Miller Act suggests that the Port project does not fall within its scope. By its terms, the federal Miller Act applies only to contracts "awarded for the construction, alteration, or repair of any public building or public work of the *Federal Government*[.]" 40 USC § 3131(b) (emphasis added). Here, the contract at issue is for a work of the Port. The Port is not an agency of the federal government, the land on which the project was built does not belong to the federal government, and the federal government was not involved in the project except as a funding source. Even then, the funds did not come directly to the Port from the federal government; rather, a state agency that had received a grant of federal funds directed those funds to the Port. Although the Miller Act does not explicitly define what it means to be a "public building or public work of the Federal Government," if the phrase is understood in a common-sense way, the Port project is not such a project.

Second, case law supports that understanding of the federal Miller Act's applicability. Most courts that have considered the question have concluded that federal funding, standing alone, does not make a project a "public building or public work of the Federal Government." *U.S. for Use of General Elec. Supply Co. v. U.S. Fidelity & Guar. Co.*, 11 F3d 577, 581 & n 3 (6th Cir 1993) (collecting cases on level of federal involvement required to make a project a work of the Federal Government and explaining that "[m]ost courts that have addressed the issue have indicated that government funding alone is not enough to make a project a 'public work'" within the meaning of the federal Miller Act ); *Mississippi Road Supply Co., v. H.R. Morgan, Inc.*, 542 F2d 262, 265-66 (5th Cir 1976) (pointing out that federal funding alone does not make a project a public

work of the federal government). A greater level of federal involvement—such as the federal government's present or intended future ownership of the project, involvement as a party to the contract, or posting of the bond against which the claim is made—is required to bring a project within the federal Miller Act. *See id.*

We are persuaded by that weight of authority that federal funding alone is insufficient to make a public contracting project subject to the federal Miller Act. As there is no evidence in the record that would permit a finding that the federal government was involved in the Port project as anything other than a funding source, the trial court correctly concluded that the federal Miller Act is not applicable to either the project or Warren's bond claim. Defendants therefore were not entitled to a directed verdict on the claim against the Skanska bond on the ground that the federal Miller Act barred the claim.

2. *Did Warren give timely and proper notice under the Little Miller Act?*

The next question we confront is whether Warren gave timely and proper notice of its claim for the unpaid amounts due to it for hauling rock from the quarry to the crusher, so as to permit its recovery against the Skanska bond pursuant to the Little Miller Act.

ORS 279C.600(1) makes the provision of proper notice a condition precedent to an action on a bond for a construction project pursuant to a public contract:

> "A person claiming to have supplied labor or materials for the performance of the work provided for in a public contract, including any person having a direct contractual relationship with the contractor furnishing the payment bond or a direct contractual relationship with any subcontractor, or an assignee of such person, or a person claiming moneys due the State Accident Insurance Fund Corporation, the Unemployment Compensation Trust Fund or the Department of Revenue in connection with the performance of the contract, has a right of action on the contractor's payment bond as provided for in ORS 279C.380 and 279C.400 only if:

"(a)   The person or the assignee of the person has not been paid in full; and

"(b)   The person gives written notice of claim, as prescribed in ORS 279C.605, to the contractor and the contracting agency."

In turn, ORS 279C.605 specifies the "substantially" required form of a notice of bond claim, as well as the timeline for providing notices. As to timing, it states, in relevant part, that "[t]he notice of claim required by ORS 279C.600 must be sent by registered or certified mail or hand delivered no later than 180 days after the day the person last provided labor or furnished materials[.]" ORS 279C.605(1).

Defendants argue that, as to unpaid amounts for Warren's hauling from the quarry to the crusher, the evidence in the record compels the finding that Warren's notice of claim was neither timely nor in the proper form. Although defendants acknowledge that Warren provided rock-hauling services in connection with the Port project until early May 2012, they argue that Warren last hauled for West Coast (as opposed to Smith) on November 19, 2011, and, for that reason, was required to give notice of its claim for amounts owed for quarry-to-crusher hauling within 180 days of that date. They also argue that, even if timely, Warren's notices of claim were improper because the notices did not segregate its claim for amounts owed by West Coast from its claim for amounts owed by Smith. In support of those arguments, defendants rely on several federal cases under the federal Miller Act that hold that a federal Miller Act claimant must give timely, separate notice with respect to each contractor or subcontractor that the claimant contends owes money. *See, e.g., U. S. for Use and Benefit of Harris Paint Co. v. Seaboard Sur. Co.*, 437 F2d 37 (4th Cir 1971); *Bowden v. United States for Use of Malloy*, 239 F2d 572, 577-78 (9th Cir 1956), *cert den*, 353 US 957 (1957).

In response, Warren argues that the trial court correctly concluded that it gave proper notice of its claim. Warren points out that the plain words of ORS 279C.605(1) require only that it give notice "no later than 180 days after the day [it] last provided labor or furnished materials," and argues that the evidence shows that it last provided rock-hauling

services in connection with the Port project in May 2012, and that it gave notice of its claim within 180 days of that date in June 2012, and again in August 2012. As to the need to segregate its claim against the Skanska bond into amounts owed by West Coast and amounts owed by Smith, Warren argues that ORS 279C.605 does not state that such segregation is required and that, in all events, Warren substantially complied with any segregation requirement by attaching relevant invoices to both Smith and West Coast to its August notice.

We again agree with Warren. Although we recognize that it is appropriate to consider case law under the federal Miller Act in interpreting the Little Miller Act, such case law is not binding and, in particular, does not control over the plain terms of Oregon's law.[7] *City of The Dalles v. D'Lectric Co., Inc.*, 105 Or App 46, 52, 803 P2d 771 (1990), *rev den*, 311 Or 261 (1991) (examining federal case law in interpreting notice provision of the Little Miller Act, but noting that the question of the proper interpretation of the Little Miller Act ultimately hinges on the wording and purpose of the Oregon statute).[8] Our job in interpreting the Little Miller Act is to give effect to its text, liberally construing that text to give effect to the purpose for which the legislature enacted the Little Miller Act: "to 'protect suppliers of materials and labor for a public works project by providing them with an alternative source of payment.'" *State v. Ross Bros. & Co., Inc.*, 268 Or App 438, 449, 342 P3d 1026, *rev den*, 357 Or 551; 357 Or 743 (2015) (citing *North Marion Sch. Dist. #15 v. Acstar Ins. Co.*, 343 Or 305, 312, 169 P3d 1224 (2007)).

---

[7] In this regard, we note that the federal Miller Act's notice provision is worded differently from the provision in Oregon's Little Miller Act. Specifically, 40 USCA section 3133(b)(2) states a potential bond claimant must give notice "within 90 days from the date on which the person performed the last of the labor or furnished or supplied the last of the material *for which the claim is made*[.]" (Emphasis added.) In other words, the plain words of the Miller Act suggest that a bond claimant might have different claims for supplying labor and materials and, correlatively, the obligation to provide timely separate notice with respect to each distinct claim, in a way that the plain words of the Oregon statutes do not.

[8] In *City of The Dalles*, this court interpreted *former* ORS 279.526 (1999), *repealed by* Or Laws 2003, ch 794, § 332. The legislature repealed that statute and replaced it with ORS 279C.605. *See* Or Laws 2003, ch 794, § 155. Upon enacting ORS 279C.605, however, the legislature retained, for the most part, the wording of *former* ORS 279.526 (1999).

Here, we are unable to read the plain text of ORS 279C.605 to require Warren to have provided notice with respect to the amounts owed for quarry-to-crusher hauling within 180 days of the date that Warren completed that part of its hauling for the project, in light of the fact that Warren continued to provide hauling services in connection with the project until May 2012. As noted, the statute states simply that Warren had to provide notice "no later than 180 days after the day the person last provided labor or furnished materials." It does not state, as defendants would have us interpret it, that Warren had to provide notice no later than 180 days after the day Warren last provided labor or materials pursuant to a contract with the particular contractor or sub-contractor alleged not to have paid. It also provides no indication that the time for providing notice for someone in Warren's particular position, who provides ongoing services in connection with a public works project pursuant to agreements with multiple parties, would begin to run any sooner than the last day on which that person provided labor or materials for the public works project at issue.

In other words, nothing in the terms of the statute would alert Warren or a similarly-situated party that it had the obligation to provide notice in the manner advocated by defendants. To construe the statute in that manner would risk depriving Warren and similarly-situated parties of the alternative source of payment that the legislature intended for such parties to have, based on a notice requirement that would not be readily apparent to such parties from the words of the statute. That would be contrary to our obligation to liberally construe the statute to protect parties in Warren's position, and to ensure that such parties are paid for their work on public works projects. *See Ross Bros.*, 268 Or App at 449. Accordingly, we conclude that Warren timely provided notice of its claim when it did so within 180 days of the day that it "last provided labor or furnished materials" for the performance of the work provided for in the Port project. *See City of The Dalles*, 105 Or App at 52 ("The relevant inquiry under the statute is when the last labor or materials were provided or furnished."). The trial court therefore did not err in denying defendants' motion for a directed verdict on the ground that Warren's notice was untimely.

As to whether the Little Miller Act required Warren to segregate its notice of bond claim by amounts unpaid by West Coast and amounts unpaid by Smith, we need not address the extent to which such segregation is required. Even if Warren was required to segregate its claim by identifying the particular amounts owed by West Coast and the particular amounts owed by Smith, it adequately did so by attaching the pertinent invoices to the revised notice of claim that it provided to defendant in August 2012. Those invoices provided defendants with notice of what unpaid amounts were attributable to West Coast, and what amounts were attributable to Smith. Accordingly the trial court did not err in denying defendants' motion for a directed verdict on the ground that Warren failed to segregate its notice of claim.

3. *Did Warren provide labor or materials "for the performance of the work" on the Port project, as required by ORS 279.600C(1)(c)?*

Defendants' final argument with respect to Warren's claim against the Skanska bond is that the hauling services that Warren provided between the quarry and the crusher were not supplied "for the performance of the work" provided for in the contract, as required by ORS 279C.600(1)(c). Citing *State v. Metropolitan Cas. Ins. Co.*, 145 Or 367, 375, 26 P2d 1094 (1933), defendants contend that labor and materials must be essential to the public works project to permit a bond claim in connection with unpaid amounts for such labor and materials. Defendants argue that the record does not permit a finding that Warren's rock-hauling between the quarry and the crusher was essential to the project, asserting that "the purchaser of lumber for a project is not liable to a trucker who hauls logs to the sawmill."

Although we do not necessarily disagree with defendants' sawmill analogy as a general matter—we certainly can envision circumstances in which someone who hauls raw material to be processed would not have a claim against a bond for the public works project in which the material ultimately is consumed—it is inapt here. Assuming, for the sake of argument, that *Metropolitan Cas. Ins. Co.*, supplies the proper construction of ORS 279C.600(1)(c) and that work

must be "essential" to the public works project, we recognize that whether particular work can be found to be "essential" to the public works project necessarily turns on the evidence in each case and, in this case, we are persuaded that the evidence would permit a reasonable factfinder to find that Warren's work hauling rock from the quarry to the crusher was essential to the work of providing the required fill rock for the Port project. 145 Or at 375. In particular, the evidence that the crusher was portable rather than a permanent operation, that the crusher originally was to operate on the job site, but was moved a short distance away for the sole purpose of avoiding wage and exercise requirements, and that Warren's original job was to deliver the rock directly from the quarry to the crusher on the job site, would permit a finding that the quarry-to-crusher leg of Warren's rock-hauling was an essential part of supplying rock to the Port project. For that reason, the trial court did not err in denying defendant's motion for a directed verdict on the ground that Warren's hauling services between the quarry and the crusher were not "for the performance of the work" involved in the Port project.

## B. *Smith Bond*

We next address defendants' argument that the trial court erred in denying their motion for a directed verdict on the claim against the Smith bond. Defendants contend that they were entitled to a directed verdict on that claim for two reasons. First, defendants point out that the Smith bond defines a claimant as "one having a direct written contract * * * with a Subcontractor of the Principal." They argue that a subcontractor is "one who has contracted with the original contractor for the performance of all or a part of the work or services which such contractor has himself contracted to perform." Because, defendants contend, Warren only had a written contract with West Coast, and West Coast does not meet defendants' proposed definition of a subcontractor, Warren did not have a direct written contract with a subcontractor. Second, defendants argue that the bond requires a claimant to provide "labor, material, or both, used or reasonably required for use in the performance of the Agreement," and Warren did not do that. Both of those arguments fail.

With respect to defendants' first argument—that West Coast was not a "subcontractor" of Smith within the meaning of the bond—that argument fails because the record would permit a reasonable factfinder to find that West Coast was a subcontractor of Smith, even under defendants' definition of the term. Under defendants' proposed interpretation, in order to be a subcontractor, West Coast would have had to contract with the "original contractor," *i.e.*, Smith, for the performance of "all or a part of the work" that that contractor had contracted to perform.

The evidence would support a finding that West Coast did just that. There is evidence that West Coast had a written contract with Smith. There is also evidence that, under that contract, West Coast was to perform a part of the "work" that Smith agreed to provide to Skanska. Under the terms of Smith's contract with Skanska, Smith agreed to provide "Work" as the contract defined that term. The "Work" under the contract included backfill and excavation, as well as the provision of all materials required to perform the backfill and excavation. West Coast, in turn, agreed to provide Smith with two types of crushed rock necessary for the backfill and excavation at the project, thereby performing a portion of the "work" that Smith agreed to perform for Skanska.

Concerning defendants' second argument, a reasonable factfinder could find that Warren also provided "labor, material, or both, used or reasonably required for use in the performance of the Agreement." The Smith bond defines "the Agreement" as the contract between Smith and Skanska. Accordingly, in order to make a claim against Smith's bond, Warren had to provide labor reasonably required for use in the performance of the contract between Smith and Skanska.

The evidence would permit a finding that Warren did that too. First, as noted, the rock that Warren delivered was necessary for the work that Smith agreed to perform for Skanska. Second, Warren's delivery of that rock, including its delivery of the rock from the quarry to the crusher, was reasonably required in order for Smith to perform that agreed-upon work. On this record, it is reasonable to infer

that, without Warren's services (or similar services by someone else), Smith would not have been able to fulfill its obligation to Skanska to supply the rock needed for the completion of the sitework that it contracted to perform. Accordingly, the trial court did not err in denying defendants' motion for a directed verdict on the Smith bond.

## C.  *Cross-Appeal*

Finally, we address Warren's cross-appeal. Warren assigns error to the trial court's computation of the damages award, arguing that the court erroneously deducted the same amount twice from the award. It is not readily clear to us that Warren preserved the assigned error. Although Warren sent a post-decision letter to the trial court suggesting that it might reconsider its damages calculation, Warren did not argue that the court's computation was not supported by the evidence. In any event, having reviewed the record, we are not persuaded that the trial court made the error that Warren claims, or that the record is such that the court would be compelled to award Warren the additional amount it seeks. For that reason, we reject Warren's assignment of error on the cross-appeal.

## CONCLUSION

For the foregoing reasons, defendants were not entitled to judgment in their favor as a matter of law on Warren's bond claims. As a result, the trial court properly denied defendants' motions for directed verdicts on the two bond claims. Further, Warren has not demonstrated any error in the trial court's computation of damages.

On appeal, limited judgment affirmed; appeal of supplemental judgment for attorney fees dismissed and remanded with instructions to vacate that supplemental judgment. On cross-appeal, affirmed.